TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-06-00682-CR






Robert Bartlett, Appellant


v.


The State of Texas, Appellee






FROM THE COUNTY COURT AT LAW NO. 5 OF TRAVIS COUNTY

NO. 679168, HONORABLE NANCY WRIGHT HOHENGARTEN, JUDGE PRESIDING





O P I N I O N


 A jury convicted Robert Bartlett of the misdemeanor offense of assault based on
evidence that he punched a woman in the mouth, breaking her upper jaw and dislocating teeth,
during an altercation at the 2004 Republic of Texas Motorcycle Rally. The trial court assessed
punishment at one year's imprisonment and a $2,000 fine, but suspended imposition of the sentence
and placed Bartlett on community supervision for two years.

 Prior to trial, Bartlett had moved unsuccessfully to suppress two categories of
evidence tending to incriminate him: (1) a written statement that he had given following the incident
and (2) photographs of his hand revealing what Bartlett admitted was "a tooth mark or something."
Bartlett had also moved unsuccessfully to quash the information--which alleged that he had
"intentionally, knowingly, and recklessly" hit the victim on or about the head with his hand--on the
ground that it failed to allege, with reasonable certainty, the acts relied upon to constitute
recklessness. See Tex. Crim. Proc. Code Ann. art. 21.15 (West 1989).

 In three issues on appeal, Bartlett asserts that the trial court abused its discretion in
failing to grant his motion to suppress evidence, refusing to quash the information, and subsequently
submitting an instruction regarding recklessness in the jury charge. We will affirm the judgment.


BACKGROUND

The assault

 Based on the evidence presented at trial, the events in question occurred in the early
morning hours of June 6, 2004, during the annual Republic of Texas Motorcycle Rally at the Travis
County Exposition Center. The rally's events and activities that evening included a Hank Williams,
Jr. concert. Heidi Amos, her parents, and a group of family friends were returning from the concert
to their campsite on the Expo Center grounds. They were riding in the back of a flatbed trailer,
which was being towed by a small four-wheel "recreational-type vehicle." According to Amos, they
were proceeding along the only road from the concert area to their campsite, which was crowded
with people on motorcycles, in four-wheel vehicles, and on foot. Amos testified that the scene was
"very much like a parade for the mere fact that there's so many people, you move very slowly."

 A motorcyclist, later identified as Bartlett, was riding in the procession immediately
behind Amos's trailer. Amos testified that Bartlett rode his motorcycle forward until his front
tire wedged against the back of her trailer, and then began performing "burnouts." (1) The force
of the accelerating motorcycle, Amos recounted, began pushing her trailer and the attached four-wheeler forward into a crowd of pedestrians. Bartlett was asked to stop. He continued. Soon
another motorcyclist joined Bartlett, with the two performing burnouts against the back of Amos's
trailer. This caused the four-wheeler to be pushed forward with even more force, causing its driver
to begin to lose control.

 Amos's group expressed displeasure at Bartlett's behavior. By one account, one of
them threw a beer bottle at Bartlett, hitting him and causing him to fall with his bike. Whatever its
precise origins, a fight broke out between Bartlett and a man named "Roy" from Amos's group. 
Amos testified that the fight lasted approximately two minutes. Afterward, Amos's group continued
slowly down the road toward their campsite. Amos did not observe Bartlett following them.

 Approximately twenty minutes later, as Amos's group was continuing along in the
procession in their trailer, they approached an area where Bartlett and his friends were camped. 
Another altercation broke out, although witnesses again differed as to how it began. Amos testified
that as her group approached, members of Bartlett's group moved toward Amos's trailer and one
threw a beer bottle at Roy. The bottle missed Roy but hit Amos in the chest. Amos testified that this
led to another altercation between Roy and Bartlett. As the two men fought on the ground near the
trailer, a "crowd of people" approached, trying to separate the two. Amos testified that when some
people tried to pull Bartlett away from Roy, Bartlett started to fight them.

 As the fighting escalated, Amos claims that she stepped off of the trailer and started
to yell, "Hey, this is enough." Before she finished that statement, Amos testified, Bartlett hit her in
the mouth with his fist. The impact broke Amos's upper jaw and fractured and dislocated her
two upper front teeth. She then fell onto broken glass, cutting her knee and ankle. EMS was
dispatched to the scene. Because of the large and tightly compacted crowds, EMS used a golf cart
to remove Amos from the Expo Center grounds to an ambulance that it parked at the Center's front
entrance. It took approximately 35 minutes for EMS to get the golf cart to Amos's location and
remove her to the waiting ambulance. Amos ultimately required multiple surgeries to her mouth,
plus stitches to her knee.


The investigation

 Sergeant Chuck Jones of the Travis County Sheriff's Office was the supervisor for
the 2-7 a.m. shift of "uniform security" at the motorcycle rally. (2) At the hearing on Bartlett's motion
to suppress, Sgt. Jones estimated the motorcycle rally crowd at "25, 28,000, I mean, 30,000 . . . it
was packed . . . and we had people left over from the concert, too." Jones's security force consisted
of a total of eight officers "actually on duty," counting Jones and two officers "held over from the
shift before to help us out because we had so much going on."

 Sgt. Jones was aware that "a pretty severe assault" had been dispatched earlier that
evening and that EMS, with some difficulty because of the large crowds, had transported the victim
to the hospital. One of the deputies on duty had found the location where the assault had occurred
or the victim had been. Jones had directed the deputy to go to the hospital and interview the victim. 
Jones, accompanied by another sergeant and a deputy, went to that location. Jones testified that these
were the only two officers he had available at the time. He used his patrol car to get to the location,
observing that "[i]t was really kind of congested for vehicles, so it was hard to get around."

 At this location, Sgt. Jones explained, were several members of the group that had
been with Amos at the time of the assault and "we had quite a few people trying to tell us what
happened and they were saying that they saw the girl get assaulted." One individual identified
himself as James Priester. According to Jones, Priester recounted that the assailant had been doing
burnouts against the back of their trailer and that "some of the people in his group," including
Priester, had "wanted to know what he was doing or got upset with him or started yelling at him, you
know, that kind of a disturbance type thing." Then, Jones indicated Priester told him, the assailant
"just started hitting people and that's when the female got assaulted."

 "Quite a few" of Priester's group, according to Sgt. Jones, also indicated that "they
found the suspect that did it." (3) Jones, with the two accompanying officers, walked with "several of"
the Priester group toward the area where they indicated the assailant was. Eventually, "several
subjects pointed out [the assailant] in a group of people." Although the officers had told the Priester
group members to remain "away back from us . . . because we told them not to go any closer because
we didn't want to have another disturbance," Jones testified that "they were close enough to point
him out," and he had no question as to which individual the group had identified.

 Sgt. Jones explained that the suspect, whom he later identified as Bartlett, was in the
midst of "another large group of people" at a campsite who appeared to be his friends. Jones asked
the two officers accompanying him to control Bartlett's group as Jones approached the suspect. 
Then, according to Sgt. Jones:


I came up behind him and told him who I--put my hand on his shoulder I think, I
believe. I believe I did. I put my hand on his shoulder and my hand on his other
hand and told him I was with the Sheriff's Department and he needed to come with
me and, you know, I didn't want to have any--any problems. So I put the handcuffs
on him.



Jones testified that he handcuffed the assault suspect to assure the officer's safety. At trial, he
elaborated:


[I]t was a security issue more than anything. I didn't want him to get hurt. Didn't
want us to get hurt. And I wanted to get him out as quickly as I could without
causing any problems . . . . we had two groups of people at that point. We had Mr.
Bartlett's group, and then we had the group with the victim that was pointing him
out. And I didn't want that--those groups getting together. I didn't want to cause
more problems than we already had.



When asked during the suppression hearing why he didn't simply interview Bartlett at his campsite,
Jones explained, "We had a lot of people to deal with . . . I didn't know Mr. Bartlett before that day
and I didn't know the people in his camp, and we had people yelling at people and other fights going
on, and I took him from the camp for our safety to go some place else and talk."

 Sgt. Jones recounted that the suspect "wanted to know what was going on" and that
Jones "just kind of explained to him that I needed to talk to him." The sergeant acknowledged that
Bartlett was "pretty cooperative" and "didn't give me any trouble at all," but observed that Bartlett's
friends "were a little agitated that I was taking Mr. Bartlett." Jones noted that "[w]e were actually
inside a group of people," so "we backed out of that group of people," and "actually some of them
followed me out of the crowd a little bit." Jones assured the crowd, "calm down, I got to talk to him,
but I'll bring him back." He explained these actions:


Because I didn't want another problem. We had three officers, we were grossly
outnumbered. Like I said, I didn't know Mr. Bartlett's group or Mr. Priester's group
before that so I didn't know what was going to happen. At that point I didn't have
Mr. Bartlett identified or anything, so I told them that to keep the other problems
from happening.



 Sgt. Jones escorted Bartlett back toward his patrol car, which was located, according
to Jones's varying estimates, 400-500 or "a few thousand" yards away. As they approached the car,
according to Jones, the Priester group "became belligerent," "started getting a little bit aggressive,"
and "mouthing off" to Bartlett. Jones placed Bartlett in the back seat. (At this point, Priester looked
inside the car and positively identified Bartlett as the assailant.) Sgt. Jones observed that some of
the people in the Priester group appeared intoxicated, and some had black eyes, cuts, and scratches. 
They confirmed, in response to Jones's inquiry, that they had been in an altercation, which Jones
deduced was the same one in which Bartlett had been involved.

 Meanwhile, Sgt. Jones recounted, "Mr. Bartlett's group had come over to
Mr. Priester's group and they were exchanging words and we were trying to separate everybody." 
The situation was deteriorating to the point that Jones "didn't feel it was safe to be there." He
decided that "it would be best to get [Bartlett] out of here." Jones testified that, given the
circumstances, using a patrol car was both the safest and the "only feasible way" of transporting
Bartlett. Jones testified that he told Bartlett that he was not under arrest but that "we were going to
go someplace where we could talk, because there was [sic] more problems coming to us as we were
getting back to the car."

 Sgt. Jones drove his patrol car, with Bartlett in the back seat, approximately two
thousand yards away from the two rival groups to a location that he described as follows:


It's a show barn. It's an open area, open walls where they had--where they keep all
the vendors for these motorcycle rallies, and the area that we had was--it was just
a little temporary looking little four foot fence that went from the vendor area to
where the registration and, you know, they kept all the drinks and stuff like that. 
The--the area we were at was a table right inside there. . . .



 Jones testified that he uncuffed Bartlett when they walked into the barn and sat at the
table. Jones added that other people were walking through the open area and could see Jones sitting
at the table with Bartlett. Jones further observed that there was nothing "hanging on the wall or
anything" indicating that the area was "the place of business" for the Travis County Sheriff's Office.

 Jones reiterated to Bartlett that "he wasn't under arrest, that he was . . . just up there
to talk to me and I wanted to hear his side of the story." (4) Jones also explained to Bartlett that he had
earlier used the handcuffs "for our safety." Bartlett began to explain to Jones his version of events. 
To summarize, Bartlett claimed that Amos and Priester's group were the first aggressors, knocking
him to the ground and hitting him. Only then, Bartlett claimed, did he hit back.

 As they were talking, Jones asked Bartlett if he "would like to make a statement." 
According to Jones, Bartlett replied, "sure." Jones again told Bartlett, "I tell people I'm not going
to arrest them, I keep my promise. You know, . . . you're not going to go to jail no matter what you
tell me." Then, leaving Bartlett unattended and uncuffed at the table, Jones walked to his patrol car,
retrieved a "voluntary statement" form, and returned to the table. At this point, Jones recited to
Bartlett the Miranda (5) warnings printed on the top of the form. Jones testified that Bartlett
understood the warnings and demonstrated to Jones's satisfaction that he could read. Jones
transcribed Bartlett's oral account and handed it to Bartlett to review. Bartlett signed and initialed
the statement. Its contents were the following:

The first time I was on my bike and I bumped a trailer. I put my wheel against the
trailer and did burn outs. Some guy jumped off the trailer and knocked me down, hit
me in the face and kicked me. Everybody broke the fight up and the trailer left. 
About half [an] hour later the trailer came back around. The people started yelling
at me. We were all fighting and everyone was hitting me. There were four or five
people hitting me and I was hitting at the people back. I hit everyone that pulled me
around and if I hit a girl I don't remember. I got cuts on my right hand that look like
a tooth mark or something.


I'm sorry if I hurt someone.



Jones informed Bartlett that the statement would be "turned in to our detectives" and that they could
later "get a warrant for your arrest." While they were at the barn, Jones took some photographs of
Bartlett, displaying the "cuts on my right hand" that Bartlett had described in his statement.

 After taking Bartlett's statement, Jones put Bartlett back in the patrol car, this time
without handcuffs, and returned Bartlett to his group. Jones told the group that he had "kept his
promise" about returning Bartlett to them, and asked them to stay away from Priester's group.




Proceedings below

 Bartlett was subsequently charged by information with "intentionally, knowingly, and
recklessly" assaulting Amos. Prior to trial, Bartlett moved to suppress his written statement and the
photographs as fruits of a warrantless arrest without probable cause or lawful authority. (6) The parties
similarly joined issue as to whether Bartlett was "in custody" within the meaning of article 38.22,
code of criminal procedure, at the time he gave his written statement. See Tex. Code Crim. Proc.
Ann. art. 38.22 (West 2005) (placing conditions on evidentiary use of written statements "made by
an accused as a result of custodial interrogation"); Miranda v. Arizona, 384 U.S. 436, 444 (1966);
Dowthitt v. State, 931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996). The trial court denied the
motion, stating that "I do find the State met its burden of showing some evidence of some
circumstances that gave rise to the need to transport Mr. Bartlett away from the scene" and that
Bartlett "was not in custody" when giving his statement.

 Bartlett also moved to quash the information on the basis that the State failed to
allege, with reasonable certainty, the acts relied upon to constitute recklessness. See Tex. Code
Crim. Proc. Ann. art. 21.15 (West 1989). The trial court denied the motion to quash, but expressly
allowed Bartlett "to reurge the motion at trial." Bartlett did raise the argument at trial, objecting on
the same grounds to the trial court's inclusion of a recklessness instruction in the jury charge. The
trial court overruled the objection.

 After hearing the evidence at trial, the jury found Bartlett guilty of the offense of
assault with bodily injury. Bartlett elected to have the trial court assess punishment, and punishment
was assessed at one year's imprisonment and a $2,000 fine. The court suspended imposition of the
sentence and placed Bartlett on two years' community supervision. This appeal followed.


DISCUSSION

Motion to suppress

 In his first issue, Bartlett contends that the trial court abused its discretion in
denying his pretrial motion to suppress his written statement and photographs. We review a trial
court's ruling on a motion to suppress evidence under a bifurcated standard of review. Ford v. State,
158 S.W.3d 488, 493 (Tex. Crim. App. 2005). The trial judge is the sole trier of fact and judge of
the credibility of the witnesses and the weight to be given to their testimony. State v. Ross,
32 S.W.3d 853, 855 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App.
1997). We give trial courts almost complete deference in determining historical facts, but we
review de novo the trial court's application of the law. Carmouche v. State, 10 S.W.3d 323, 327
(Tex. Crim. App. 2000). Where, as here, the trial court did not make explicit written findings of
fact, we view the evidence in the light most favorable to the trial court's rulings and assume that
the trial court made implicit findings of fact that are supported by the record. Ford, 158 S.W.3d
at 493. We "uphold the trial court's ruling if it is reasonably supported by the record and is
correct under any theory of law applicable to the case." State v. Steelman, 93 S.W.3d 102, 107
(Tex. Crim. App. 2002).

 Bartlett urges that his "statement and the photographs of him are the products of an
unlawful arrest and an improper custodial interrogation." In support, he devotes much of his briefing
to establishing that Sgt. Jones had "seized" him under the meaning of the Fourth Amendment and
article I, section 9 of the Texas Constitution. See California v. Hodari D., 499 U.S. 621, 628 (1991)
(Fourth Amendment "seizure" occurs when reasonable person would not believe that he was free
to leave and either (1) officer applied physical force with lawful authority, or (2) suspect submitted
to assertion of authority); Johnson v. State, 912 S.W.2d 227, 232-35 (Tex. Crim. App. 1995)
(holding that the Hodari D standard also defines "seizures" under article I, section 9). Bartlett
describes his seizure interchangeably as "custody" and a warrantless arrest. He asserts that "he was
seized and restrained of his liberty (i.e., under arrest) from the moment that Jones placed him in
handcuffs, identified himself as being with the Sheriff's Department, placing his hands upon
Appellant, and telling him 'he needed to come with me.'" Bartlett argues that Sgt. Jones lacked
probable cause or legal authority to arrest him or take him into custody without a warrant. 
See United States v. Watson, 423 U.S. 411, 417 (1976); Tex. Code Crim. Proc. Ann. art. 14.03(a)(1),
(2) (West Supp. 2007).

 The State concedes that Sgt. Jones "seized" Bartlett, but argues that the seizure did
not constitute "custody" or a warrantless arrest, but was instead an investigative detention. (7) Under
both the Fourth Amendment and article I, section 9 of the Texas Constitution, a law enforcement
officer may stop and briefly detain a person without probable cause whom he reasonably suspects
of criminal activity. Balentine v. State, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002) (citing Terry
v. Ohio, 392 U.S. 1, 21-22 (1968)); Rhodes v. State, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997). 
Although both constitute seizures, investigative detentions are not arrests, and are not subject to
the requirements of a warrant or probable cause. See State v. Moore, 25 S.W.3d 383, 386
(Tex. App.--Austin 2000, no pet.). (8) Nor do investigative detentions constitute "custody" in the
sense of article 38.22 and Miranda. "A person is in custody if, under the totality of the
circumstances, a reasonable person would believe his freedom of movement was restrained to the
degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994); Dowthitt
v. State, 931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996); Houston v. State, 185 S.W.3d 917,
920 (Tex. App.--Austin 2006, pet. ref'd). Thus, a valid investigative detention, which is
characterized by lesser restraint than an arrest, does not constitute custody. See Berkemer
v. McCarty, 468 U.S. 420, 438-39 (1984) (traffic stops and Terry stops are considered seizures but
not custody because of their "nonthreatening," "noncoercive," and "brief" character compared
to formal arrests); Dowthitt, 931 S.W.2d at 255 ("Stansbury indicates that the restriction upon
freedom of movement must amount to the degree associated with an arrest as opposed to an
investigative detention.").

 In his briefing, Bartlett did not squarely address the State's contention that Sgt.
Jones's seizure of him constituted an investigative detention, arguing essentially that he was seized
and that status, without more, equals an arrest and custody. During oral argument, Bartlett disputed
whether the State met its burden of justifying an investigative detention as of the time Jones initially
restrained him. An investigative detention is justified when the detaining officer has specific
articulable facts, which, taken together with rational inferences from those facts, lead him reasonably
to suspect that the person detained actually is, or has been, or soon will be involved in criminal
activity. Balentine, 71 S.W.3d at 769. The record supports the trial court's implied findings of such
facts here. Jones testified that a "pretty severe assault" at the motorcycle rally had, in fact, been
reported earlier in the evening and that EMS had transported an injured victim to the hospital. Jones
proceeded to the location that a deputy had previously determined to be the site of the assault. While
there, several persons claiming to be eyewitnesses to the assault approached the officers, described
what had happened, and volunteered that they could identify the assailant and knew where he was. 
One of these individuals, James Priester, identified himself to Jones. Several members of this group,
including Priester, then led Sgt. Jones to Bartlett's location, where they pointed out Bartlett as the
assailant. These specific facts gave Sgt. Jones a basis to reasonably suspect that Bartlett had been
involved in the reported assault and warranted his temporary detention for further investigation. See
State v. Fudge, 42 S.W.3d 226, 228-32 (Tex. App.--Austin 2001, no pet.) (cab driver's unsolicited,
in-person report to law enforcement that he had seen another motorist driving as if drunk and
identification of the vehicle when it approached was sufficient to warrant an investigatory stop).

 Bartlett further suggests that the extent or degree of his restraint--especially the fact
he was handcuffed and placed in the patrol car--would have caused a reasonable person to believe
his freedom of movement was restrained to the degree associated with a formal arrest. However, an
officer conducting an investigative detention may use such force as is reasonably necessary under
the circumstances to effect the goal of the stop: investigation, maintenance of the status quo, or
officer safety. Rhodes, 945 S.W.2d at 117. Whether such use of force elevates the detention to
custody or an arrest turns on the reasonableness of the intrusion under all of the facts. Moore,
25 S.W.3d at 386. Factors that may be considered in this inquiry include the degree of force
employed, the nature of the crime under investigation, the degree of suspicion, the location of the
detention, the time of day, the reaction of the suspect, and whether the officer actually conducts an
investigation. Id. "[C]ommon sense and ordinary human experience must govern over rigid
criteria." Rhodes, 945 S.W.2d at 118. "Furthermore, allowances must be made for the fact that
officers must often make quick decisions under tense, uncertain and rapidly changing
circumstances." Id. Consequently, there may be circumstances in an investigative detention that
reasonably justify an officer handcuffing a suspect, Balentine, 71 S.W.3d at 771 ("There is no
bright-line test providing that mere handcuffing is the equivalent of an arrest."); Rhodes, 945 S.W.2d
at 117-18, placing a suspect in a police car, Balentine, 71 S.W.3d at 771, or transporting the suspect
to another location for questioning. Josey v. State, 981 S.W.2d 831, 841 (Tex. App.--Houston
[14th Dist.] 1998, pet. ref'd) ("Safety and security reasons may justify moving a suspect from one
location to another during an investigatory stop.").

 Also bearing on the custody inquiry is the principle that the "reasonable person"
standard presupposes an innocent person. Florida v. Bostick, 501 U.S. 429, 438 (1991); Dowthitt,
931 S.W.2d at 254; Ramirez v. State, 105 S.W.3d 730, 738 (Tex. App.--Austin 2003, no pet.). 
Moreover, the determination of custody depends on the objective circumstances of the interrogation,
not the subjective views of the person being questioned or the subjective intent of the officer to arrest
or not arrest. Stansbury, 511 U.S. at 323; Dowthitt, 931 S.W.2d at 254; Houston, 185 S.W.3d at 920. 
But the subjective intent of the officer may be relevant as a circumstance of the interrogation if it is
conveyed to the individual being questioned, but only to the extent that the communication of those
views would affect a reasonable person's understanding of his freedom of action. See Stansbury,
511 U.S. at 325; Dowthitt, 931 S.W.2d at 254; Houston, 185 S.W.3d at 920.

 Sgt. Jones testified that he handcuffed Bartlett--whom had just been identified by
several people as the perpetrator of a "pretty severe assault"--to ensure both Bartlett's safety and
his own. Rather than questioning Bartlett at his campsite, Sgt. Jones sought to "get him out as
quickly as I could" in order to head off a potentially volatile situation between Bartlett's "large group
of people" and the similarly "large" Priester group. Jones observed that the three officers "were
grossly outnumbered" by the two groups. Jones saw fit to "back[] out of that group of people,"
whom he characterized as "agitated," and some even started to follow the uniformed officers. 
"Because [he] didn't want another problem," Jones assured Bartlett's group, "calm down, I got to
talk to him, but I'll bring him back." Jones recounted that the situation degraded as they proceeded
to the patrol car, where they were confronted by the "belligerent" Priester group, some of whom were
intoxicated and showed signs they had been in a fight. Worse, according to Sgt. Jones, Bartlett's
group came over "to Mr. Priester's group and they were exchanging words and we were trying to
separate everybody." Jones "didn't feel it was safe to be there," and used his patrol car to remove
Bartlett from the treacherous environment. Given the circumstances, Jones believed that the patrol
car was the safest and "only feasible way" to remove Bartlett.

 On this record, the trial court could have impliedly found that Sgt. Jones's decision
to transport Bartlett away from the scene in his patrol car was reasonably necessary to maintain the
status quo and effect the safety of both the officers and Bartlett himself. See Josey, 981 S.W.2d
at 841 (Tex. App.--Houston [14th Dist.] 1998, pet. ref'd); Perez v. State, 818 S.W.2d 512, 516
(Tex. App.--Houston [1st Dist.] 1991, no pet.). The same can be said regarding Jones's decision
to handcuff Bartlett. See United States v. Sanders, 994 F.2d 200, 205-08 (5th Cir. 1993)
(summarizing cases in which handcuffing suspect was deemed necessary "to allow the officer to
pursue his investigation without fear of violence.").

 Adding further support to these implied findings are the events once Sgt. Jones and
Bartlett reached the "show barn" a safe distance from the volatile environment from which they
came. Jones removed the handcuffs from Bartlett and did not apply them again. Jones also
explained to Bartlett that he had used the handcuffs "for our safety." Further, Sgt. Jones actually
conducted an investigation, asking Bartlett to tell his side of the story. See Rhodes, 945 S.W.2d at
119, 119-20 (Meyers, J., concurring) (suggesting that "whether a detention is an arrest or an
investigatory stop turns, in large part, upon whether an investigation has occurred).

 Sgt. Jones also repeatedly voiced his intent not to arrest Bartlett, but only to question
or "talk to him." An officer's subjective views may be relevant to the custody determination to the
extent they are communicated and would affect a reasonable person's understanding of his freedom
of action. See Stansbury, 511 U.S. at 325. Jones testified that he "didn't have the manpower or the
inclination to take [Bartlett] to jail that night, so I had already made up my mind that I wasn't going
to make an arrest." When Jones detained Bartlett, he told Bartlett's friends, "I got to talk to him, but
I'll bring him back." This evidence supports the trial court's implied finding that Bartlett heard these
statements. Also, at the patrol car, Jones recounted that he told Bartlett he was not under arrest and
that "we were going to go someplace where we could talk, because there was [sic] more problems
coming to us as we were getting back to the car." Further, when at the show barn, Jones reiterated
to Bartlett that "he wasn't under arrest, that he was . . . just up there to talk to [Jones] and [Jones]
wanted to hear his side of the story."

 Finally, the setting to which Bartlett was transported is relevant to the custody
determination. The record reflects that the "show barn" was an "open area" with "open walls"
"where they keep all the vendors." Sgt. Jones explained that other people were walking through this
area and could see him sitting at the table with Bartlett. Jones also testified that there was nothing
in the area indicating that it was "the place of business" for the Travis County Sheriff's Office. In
addition, Sgt. Jones, after having informed Bartlett that he was not under arrest, left Bartlett alone
and uncuffed while he went to his patrol car to retrieve the "voluntary statement" form.

 In summary, the record supports the conclusion that Sgt. Jones's seizure of Bartlett
was an investigative detention, not an arrest or custody. The district court did not abuse its discretion
in overruling Bartlett's motion to suppress. We overrule Bartlett's first issue.


Motion to quash

 In his second issue, Bartlett asserts that the trial court abused its discretion in
overruling his motion to quash the information. Whether a charging instrument provides sufficient
notice to the accused is a question of law that we review de novo. See State v. Moff, 154 S.W.3d
599, 601 (Tex. Crim. App. 2004).

 The information alleged, in relevant part:


Robert Bartlett, the Defendant, on or about June 6, 2004, did then and there
intentionally, knowingly, and recklessly cause bodily injury to Heidi Amos by hitting
Heidi Amos on or about the head with the Defendant's hand.



Bartlett complains that the information fails to provide notice of the act or acts the State relies upon
to constitute the culpable mental state of recklessness. In particular, he relies on article 21.15 of the
code of criminal procedure, which states:


Whenever recklessness or criminal negligence enters into or is a part or element of
any offense, or it is charged that the accused acted recklessly or with criminal
negligence in the commission of an offense, the complaint, information, or
indictment in order to be sufficient in any such case must allege, with reasonable
certainty, the act or acts relied upon to constitute recklessness or criminal negligence,
and in no event shall it be sufficient to allege merely that the accused, in committing
the offense, acted recklessly or with criminal negligence.


Tex. Code Crim. Proc. Ann. art. 21.15.


 The State responds that article 21.15 is inapplicable. It relies on Crawford v. State,
646 S.W.2d 936 (Tex. Crim. App. 1983), which involved an indictment alleging--like the
information here--that the defendant had acted "intentionally, knowingly, and recklessly." Id. at
937. Crawford had moved to quash the indictment, urging that it "failed to allege with reasonable
certainty the act or acts relied on to constitute recklessness." Id. The trial court overruled the
motion, and Crawford was ultimately convicted. Crawford appealed, bringing a single point of error
challenging the trial court's ruling on his motion to quash. The court of criminal appeals affirmed,
reasoning that:


All three of the culpable mental states, intentionally, knowingly, and recklessly, were
alleged. Since it is sufficient to allege either of the culpable mental states, the
indictment on its face alleges two culpable mental states, intentionally and
knowingly, which are not subject to the complaint concerning the culpable mental
state, recklessly, made in the appellant's motion to quash. The indictment is
sufficient and we need not determine the requirements of the indictment, if recklessly
had been the only alleged culpable mental state.



Id. at 937. As the State views the case, Crawford holds that article 21.15 governs only when 
recklessness is the sole culpable mental state alleged--not where, as here, recklessness is
alleged along with intentional or knowing conduct. This Court has previously expressed the same
view, albeit in dicta. (9)

 Bartlett attempts to distinguish Crawford as addressing not the sufficiency of notice,
but the concept of "fundamental defect" in charging instruments then recognized by the court of
criminal appeals. Under this concept, if a charging instrument failed to allege all elements of the
offense, any subsequent judgment of conviction was deemed void and could be attacked at any time
on direct appeal or through a post-conviction habeas petition. See Ex parte Patterson, 969 S.W.2d
16, 18 (Tex. Crim. App. 1998) (surveying this history). By contrast, certain other defects in charging
instruments were considered merely of "form" and were required to be raised in a timely manner or
be waived. See Gengnagel v. State, 748 S.W.2d 227, 228-29 (Tex. Crim. App. 1988). Regarding
article 21.15's requirements in particular, the court of criminal appeals distinguished between the
failure of a charging instrument "to allege with reasonable certainty the acts relied upon to constitute
recklessness," which it deemed a complaint of "form" that "g[a]ve[] the accused grounds to
complain before trial of inadequate 'notice,'" and a failure to allege "the acts themselves," which
constituted a fundamental defect. Id.; see Graham v. State, 657 S.W.2d 99, 104 (Tex. Crim. App.
1983). Contrary to Bartlett's view, Crawford addresses the former type of challenge.

 The defendant in Crawford had moved to quash the indictment, according to the court
of criminal appeals, on the basis that the instrument "failed to allege with reasonable certainty the
act or acts relied on to constitute recklessness." 646 S.W.2d at 937 (emphasis added). This was the
sole issue on appeal. Id. The court of criminal appeals termed such a complaint one of "form" that
"gives the accused grounds to complain before trial of inadequate 'notice.'" Gengnagel, 748 S.W.2d
at 228-29. The defendant employed the appropriate procedural mechanism--a motion to quash--for
challenges based on inadequate notice. See id. at 228. Although the Crawford court did not
elaborate extensively on its reasoning, its references to the "sufficiency" of the indictment are
consistent with the court's nomenclature in cases involving notice-based challenges. See Graham,
657 S.W.2d at 104; cf. Gengnagel, 748 S.W.2d at 230 (referring to a "fundamentally defective"
charging instrument). We see no basis for distinguishing what would appear to be the squarely
controlling precedent of the court of criminal appeals in Crawford.

 The charging instrument here, like that in Crawford, alleges not only recklessness,
but intentional and knowing conduct. The Crawford court relied on this feature of the instrument
in holding that it "need not determine the requirements of the indictment, if recklessly had been the
only alleged culpable mental state." 646 S.W.2d at 937. The same rationale is fatal to Bartlett's
complaint regarding article 21.15. We accordingly overrule Bartlett' second issue.

 Relying on the same underlying theory, Bartlett asserts in his third issue that the trial
court abused its discretion in instructing the jury regarding the culpable mental state of recklessness. 
Bartlett acknowledges that this issue would be foreclosed by our adverse disposition of his second
issue. Consequently, we overrule Bartlett's third issue.


CONCLUSION Having overruled Bartlett's issues on appeal, we affirm the judgment of
the trial court.


 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: February 21, 2008

Publish
1. A "burnout," Amos explained, is a technique in which a motorcyclist throttles his or her
engine while the front wheel is held stationary, causing the back wheel to spin uncontrollably, often
accompanied by considerable smoke and loud engine noise. According to Sergeant Chuck Jones of
the Travis County Sheriff's Office, whose pivotal role in the underlying events is discussed below,
many of the motorcyclists at the rally would ride around a large loop around the Expo Center
grounds that was "basically called a parade area," where "the people parade their motorcycles . . .
do burnouts, spin their tires . . . show how fast their bike runs, how much noise it makes . . .
especially at night because of the exhaust lighting up . . . and they just keep going around this loop." 
2. Jones explained that he was in uniform but off-duty, having clocked out of his normal shift
with Travis County before coming to the Expo Center.
3. By this time, Jones estimated that "an hour . . . hour and a half maybe" had elapsed since
EMS had transported the victim away.
4. Jones added that, in fact, he "didn't have the manpower or the inclination to take [Bartlett]
to jail that night, so I had already made up my mind that I wasn't going to make an arrest."
5. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).
6. During the hearing, Bartlett's trial counsel specifically relied on "Article I, Section 9 of the
Texas Constitution, the Fourth Amendment and the Fourteenth Amendment of the United States
Constitution, Article 38.23 and Chapter 14 of the Code of Criminal Procedure."
7. The State concedes that at the time he initiated the seizure, Sgt. Jones lacked probable
cause or lawful authority to arrest Bartlett.
8. By post-submission letter, Bartlett emphasizes a recent decision from the Dallas Court of
Appeals, State v. Purdy, No. 05-07-00133-CR, 2008 Tex. App. LEXIS 102 (Tex. App.--Dallas Jan.
9, 2008, no pet. h.), which he cites for the proposition that "an 'arrest' under Article 14.03, C. Cr.
P., is not limited to a formal, custodial arrest, and may include detention pursuant to a reasonable
suspicion." To the extent Bartlett views Purdy as blurring the distinctions between investigative
detentions and arrests in any manner relevant to this case, we reject that contention. Purdy and
the line of decisions on which it relies stand for the narrow concept that the limitations
within subsections (d) and (g) of article 14.03 on warrantless "arrests" by law enforcement officers
outside their territorial jurisdictions similarly restrict such officers' investigative detentions. See
Purdy, 2008 Tex. App. LEXIS 102, at *5-*6 (discussing Brother v. State, 166 S.W.3d 255, 256-60
(Tex. Crim. App. 2005), cert. denied, 546 U.S. 1150 (2006)); see also State v. Kurtz, 152 S.W.3d
72, 79-80 (Tex. Crim. App. 2005); and Mitchell v. State, 187 S.W.3d 113, 116 (Tex. App.--Waco
2006, pet. ref'd).
9. See State v. McCoy, 64 S.W.3d 90, 94 n.2 (Tex. App.--Austin 2001, no pet.) (holding that
charging instrument alleging only reckless conduct failed to comply with article 21.15, but
distinguishing those alleging intentional, knowing, and reckless conduct on basis that under
Crawford, an "indictment alleging that defendant acted intentionally, knowingly, and recklessly need
not comply with article 21.15 requirements."); see also Griffin v. State, No. 03-02-00016-CR, 2003
Tex. App. LEXIS 1711, at *3 (Tex. App.--Austin Feb. 27, 2003, no pet.) (mem. op., not designated
for publication) ("[B]ecause the indictment alleged that Griffin acted intentionally and knowingly,
as well as recklessly, compliance with article 21.15 was not required." (citing Crawford)).