# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00542-CR

**Jose DeJesus Cuevas, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
### NO. 12402, HONORABLE CHARLOTTE HINDS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Jose DeJesus Cuevas of the offense of indecency with a child by contact. *See* Tex. Penal Code Ann. § 21.11(a)(1) (West 2003). Punishment was assessed at ten years' imprisonment and a $2,500 fine, but the district court suspended imposition of the sentence and placed Cuevas on probation for ten years. In a single issue on appeal, Cuevas challenges the admissibility of certain statements he allegedly made to the police. We will affirm the judgment of conviction.

## BACKGROUND

The complainant in this case was M.B., an 11-year-old girl. The jury heard evidence that on July 20, 2006, M.B.'s grandmother, apartment manager Elena Bosley of San Marcos, traveled to Smithville to train Mary Trinidad, the new manager of an affiliated apartment complex. M.B. accompanied Bosley on the trip. Bosley testified that when they arrived, she worked with Trinidad

in the office area while M.B. watched television in a living-room area down the hall. According to Bosley, she eventually heard "a lot of laughter" and M.B. "being quite loud." Trinidad went to the other room and asked M.B. to be quiet. When Trinidad returned to the office, she reported to Bosley that M.B. was "playing tag" with Cuevas, the property's maintenance man. Bosley testified that she and Trinidad continued working while Cuevas and M.B. continued playing "for a couple of hours."

Later that day, Bosley explained, M.B. came into the office upset and indicated that Cuevas had been "kissing her and grabbing her privates." Trinidad called Cuevas into the office and confronted him with the accusations. According to Bosley, Trinidad and Cuevas spoke to each other in Spanish. Bosley testified that Cuevas denied the accusations and left the room. The next day, Bosley reported M.B.'s accusation to the police.

Detective Lonny Richardson of the Smithville Police Department decided to interview Cuevas. When Richardson learned that Cuevas was not fluent in English, he contacted Trinidad and "requested that she have [Cuevas] come over at a specific time for the interview." The interview was scheduled for August 4, 2006. Because Richardson was not fluent in Spanish, he arranged to have Officer Noe Martinez, a Spanish-speaking investigator from the Bastrop County Sheriff's Department, present during the interview. According to Richardson, Cuevas arrived at the police department at the pre-arranged time. Richardson met Cuevas in the lobby and directed him to the interview room. Richardson testified that Martinez conducted the interview while Richardson primarily observed.

Martinez testified at trial about the interview. According to Martinez, after he advised Cuevas of his rights, and Cuevas indicated that he understood those rights, he questioned Cuevas

2

about the incident. Martinez testified that Cuevas repeatedly denied kissing or touching M.B., except on the back of her shoulder while they were "playing tag." Martinez recalled that the interview with Cuevas lasted approximately 30 to 35 minutes. At the end of the interview, Martinez asked Cuevas if he would consent to a second interview. According to Martinez, Cuevas agreed. Cuevas then left the police department. Martinez then advised Richardson that, in his opinion, Cuevas was not being truthful.

Richardson scheduled the second interview for August 31, 2006. When Cuevas arrived at the police department that day, he was again directed to an interview room. This time, Cuevas was interviewed by Sergeant Sabino Martinez, a Spanish-speaking officer with the Department of Public Safety Criminal Intelligence Service.[1] During this interview, Sabino testified, Cuevas admitted to kissing and touching M.B.:

Q: So over the course of this interview, did you in fact talk to him about the allegations made by [M.B.] from July 20 of 2006?

A: Yes, I did.

. . . .

Q: And as you are confronting the defendant with the evidence that you have gathered from the Smithville Police Department, does he make an admission to you?

A: Yes, he does.

Q: And what admission?

---

[1] To avoid confusing Sergeant Sabino Martinez with Officer Noe Martinez, we will refer to Sabino Martinez using his first name.

A:      He said he touched the victim's [sexual organ], which is [M.B.], over his
        clothes—over her clothing—I'm sorry—and had kissed her, as she alleged.

. . . .

Q:      So after he makes that statement to you, do you request him to move to
        another room?

A:      Yes, that's correct.

Q:      And do you inform Lieutenant Richardson that something has happened?

A:      Yes.  I informed him that Cuevas had admitted to the allegations from the
        victim.  And I told him that we were going to move to another room so we
        can go ahead and tape the interview, and so I could translate to Lieutenant
        Richardson what Cuevas had admitted.

Q:      And while y'all are still in the first room, you know, after he admits to
        touching the victim's [sexual organ] over her clothes and kissing her, do you
        talk about the sexuality of this contact?

A:      I asked him if the touching was for a sexual impulse—that he felt some type
        of impulse, and then touched the victim, and he admitted that he had.

After obtaining the above admissions, which were not recorded, Sabino moved Cuevas to the other

interview room, brought in Richardson, and, after again advising Cuevas of his rights, proceeded to

interview him.  During this interview—which was recorded—apparently Cuevas again admitted to

4

committing the offense.[2]  At the conclusion of the interview, Cuevas was again released.  He was arrested several days later, on September 5, 2006.

At Cuevas's trial, in addition to the above evidence, the jury heard testimony from M.B., who testified about her recollection of what happened on the day of the incident.  M.B. testified that, while she and Cuevas were taking a break from playing tag, Cuevas "tried to French-kiss me" and "grabbed my private" "with his hands."  Cuevas testified in his defense and denied the allegations against him.  On cross-examination, when Cuevas was confronted with his admissions during the recorded interview, he claimed that he did not understand the questions that were being asked.  Several other witnesses, primarily Cuevas's relatives, also testified on Cuevas's behalf.

The jury found Cuevas guilty of committing the offense of indecency with a child by contact, and he was placed on probation.  This appeal followed.

## ISSUE PRESENTED

In his sole issue on appeal, Cuevas asserts that the district court abused its discretion in denying his motion to suppress the unrecorded statements that he made to Sabino during the second interview.  He claims that he was in custody when he made these statements and, therefore, the unrecorded statements were inadmissible.  *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3

---

[2]  A DVD recording of the interview, conducted in Spanish, was played for the jury while a courtroom interpreter translated what was being said.  Although there is no English translation included in the record before us, we have nevertheless reviewed the DVD.  We observe that at several points during the interview, the recording reflects that Sabino translated to Richardson the questions he was asking and Cuevas's responses to those questions.  One such response, according to Sabino in the recording, was Cuevas admitting to kissing M.B. and then touching her sexual organ over her clothing.

5

(West 2005) (providing that oral statement of accused resulting from custodial interrogation is inadmissible unless, among other things, it is electronically recorded). We note that, on appeal, Cuevas does not challenge the admissibility of any other evidence obtained during his interviews at the police department, including the DVD recording of his interview with Sabino while Richardson was present. In response, the State argues that at the time the complained-of statements were made, Cuevas was not "in custody" for the purposes of article 38.22.

## STANDARD OF REVIEW

"A trial court's ruling on a motion to suppress, like any ruling on the admission of evidence, is subject to review on appeal for abuse of discretion." *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). "'In other words, the trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case.'" *Id*. (quoting *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008)). "In reviewing a trial court's ruling on a motion to suppress, appellate courts must view all of the evidence in the light most favorable to the trial court's ruling." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

We are to "afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We are to "afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on

6

an evaluation of credibility and demeanor." *Id*. "A trial judge's ultimate 'custody' determination 'presents a 'mixed question of law and fact.''" *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112-13 (1995)). "Therefore, we afford almost total deference to a trial judge's 'custody' determination when the questions of historical fact turn on credibility and demeanor." *Id*. at 526-27 (citing *Ripkowski v. State*, 61 S.W.3d 378, 381 (Tex. Crim. App. 2001)). "Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial judge's 'custody' determination de novo." *Id*. at 527.

**ANALYSIS**

For Cuevas's unrecorded statements to be inadmissible, they must have been the result of "custodial interrogation." *See* Tex. Code Crim. Proc. Ann. art. 38.22, §§ 3, 5; *Herrera*, 241 S.W.3d at 525. "Custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A person is in "custody" only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)); *Bartlett v. State*, 249 S.W.3d 658, 668 (Tex. App.—Austin 2008, pet. ref'd). The "reasonable person" standard presupposes an innocent person. *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)); *Bartlett*, 249 S.W.3d at 669. Moreover, the determination of custody depends on the objective circumstances of the interrogation, not the

7

subjective views of the person being questioned or the subjective intent of the officer to arrest or not arrest. *Stansbury*, 511 U.S. at 323; *Dowthitt*, 931 S.W.2d at 254; *Bartlett*, 249 S.W.3d at 669. The court of criminal appeals has outlined at least four general situations which may constitute custody: "(1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave." *Dowthitt*, 931 S.W.2d at 255.

Cuevas's argument implicates the third situation. He claims that the officers' actions during the second interview created a "de facto" custody situation. In his brief, Cuevas focuses specifically on a polygraph exam that Sabino administered to him during the interview. In a hearing outside the presence of the jury,[3] Sabino testified that Cuevas admitted kissing and touching M.B. only after Cuevas had completed a polygraph exam and Sabino informed him that the result of the exam was "deception indicated." According to Cuevas, "once Martinez confronted him with the results of the polygraph . . . he was in custody at that point, and any **unrecorded** questioning and statements elicited after that point are inadmissible."[4]

---

[3] References to a polygraph exam, or to its results, are inadmissible for all purposes. *Martinez v. State*, 272 S.W.3d 615, 626 (Tex. Crim. App. 2008) (citing *Nesbit v. State*, 227 S.W.3d 64, 66 n.4 (Tex. Crim. App. 2007)). All testimony regarding the polygraph exam was elicited during a hearing outside the presence of the jury.

[4] Cuevas concedes in his brief that "he was not in custody during the first interview with Noe Martinez, or during the pre-test interview with Sabino Martinez, or during the [p]olygraph examination." Moreover, Cuevas does not contend that his recorded statements were inadmissible.

As support for this contention, Cuevas relies primarily on *McCrory v. State*, 643 S.W.2d 725 (Tex. Crim. App. 1982). In *McCrory*, the defendant took a polygraph exam, was advised that he had been "deceptive in his responses," and subsequently confessed to committing the crime after being subjected to a "post-test interview" by both law enforcement and a forensic psychiatrist. *See id*. at 728-30. The court held that McCrory was in custody at the time he had confessed and, therefore, his oral confession was inadmissible. *Id*. at 734. In making the custody determination, the court focused on the "totality of the circumstances." *Id*. at 734. Thus, the polygraph exam, although one factor the court considered, was not dispositive.[5] Instead, the court focused on evidence tending to show that McCrory was not "free to leave" during the interview. *See id*. at 731-32.

In contrast, the evidence in this case supports a finding by the district court that a reasonable person in Cuevas's position would have understood that he was free to leave. Lieutenant Richardson testified that he arranged the second interview by contacting Mary Trinidad, Cuevas's employer, and advising her of the time and the date of the interview. Richardson testified that he did not tell Trinidad "that [Cuevas] had to come," nor did he arrange transportation to the police department. When asked if at the time Cuevas arrived at the police department, Cuevas gave any indication that he did not want to be there, Richardson testified, "He did not." Richardson also testified that during the recorded interview following the polygraph, Cuevas did not make any

---

[5] In fact, it is well settled that custody does not occur merely because the suspect submits to and fails a polygraph. *See, e.g.*, *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996); *Shiflet v. State*, 732 S.W.2d 622, 630-31 (Tex. Crim. App. 1985); *Stone v. State*, 583 S.W.2d 410, 413 (Tex. Crim. App. 1979); *Turner v. State*, 252 S.W.3d 571, 577 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd).

movements to try to leave. When asked what he would have done if Richardson had tried to leave, Richardson testified, "I would have opened the door for him and escorted him through the locked door to the outside." According to Richardson, he conveyed this information to Cuevas through Sabino. Richardson further testified that Cuevas did in fact leave the police department after the interview was completed. Richardson concluded, "To the best of my knowledge he would have no reason to believe that he was not free to leave at his own will."

Sergeant Sabino Martinez provided similar testimony. Sabino testified that at the "very beginning" of the interview, he read to Cuevas in Spanish the contents of a "waiver of rights" form. One of these rights was to "not make any statement at all," and another was "to terminate or stop the interview at any time." Cuevas signed the form, thus indicating that he "knowingly, intelligently, and voluntarily" waived those rights. The State then elicited the following testimony about whether Sabino informed Cuevas that he was free to leave:

> Q: Did you ever inform the defendant that he was free to leave any time he decided he wanted to go?
>
> A: Yes. In the form I made sure he understood that.
>
> Q: And so you verbally gave it to him?
>
> A: Yes.
>
> Q: As well as a signed piece of paper?
>
> A: Yes, correct.
>
> Q: Did you ever tell him that, again, during this process?

A:      I believe when we were talking to the officer in the taping, itself, I did tell him, yes, you're free to leave. You're not forced to be here. And at one point I asked him, have we promised you anything? . . . And he said, no.

Q:      So based on your experience, as a police officer, and a Spanish-speaker, was he getting the fact that he was not in custody?

A:      I think so.

Q:      Everything—

A:      I think he was.

Q:      —everything he signed and said to you indicated he was?

A:      Correct. For him, this was two or three forms to tell him that,[6] and him still continuing.

Sabino also testified that Cuevas did not seem reluctant to take the polygraph exam and took the exam "right away." According to Sabino, Cuevas was cooperative during the exam—"he wasn't one of these persons that tries to move or some type of counter-measures."

Sabino explained that Cuevas admitted to the offense "maybe 15 or 20 minutes" after being confronted with the results of the polygraph. After Cuevas made his admission, Sabino testified, they moved to another room and Sabino again reiterated that Cuevas was free to leave: "I made sure that he understood that he could leave at any time at that point." When asked if Cuevas decided to stay, Sabino testified, "He stayed. He didn't move."

_____

⁶ The only other form from the second interview in the record is a form written entirely in Spanish apparently giving consent to submit to the polygraph exam. A translation of the form does not appear in the record. However, Sabino testified that the form states, "I can leave any time I desire." Cuevas's signature appears on this form.

11

Sabino also testified that he was fluent in the Spanish language and that he has the ability to speak different dialects of Spanish based on the education level of the person with whom he is communicating. According to Sabino, he and Cuevas were able to converse in Spanish and understand one another. Sabino testified that he did not detect that Cuevas had any difficulty understanding what he was telling him. We also observe that, unlike in *McCrory*, the evidence shows that Cuevas left the police department after the interview concluded. He was not arrested until several days after the interview.

Cuevas also testified at the suppression hearing. When asked if he recalled being told by Sabino at the start of the interview that he was free to go, Cuevas testified, "I was so bad in my ears, I was not hearing what he was saying. I never understood him to say that. If I had understood him to have said that, I would have left." Cuevas also testified that the officers called Trinidad and "told her that I had to show up at the Police Station to be interviewed." When asked if he understood that his presence was "required," Cuevas testified, "It was voluntary, yeah, but they were telling me that I had to show up at a certain time and I had to comply with that."

On cross, Cuevas admitted that he drove himself to the police department in his truck. However, he testified that he thought he was "obligated" to be at the police department "because they told me I had to show up." Cuevas also acknowledged that he understands the Spanish language. He testified that he signed both the waiver-of-rights form and the form consenting to the polygraph. Cuevas denied that Sabino told him that he was free to leave and that he did not have to take the exam. According to Cuevas, he knew the polygraph form "said that I could leave, but

12

I never understood that this meant I could actually get up and leave." Cuevas repeated, "If I had understood that, I would have left."

Resolving the conflict between Cuevas's testimony and the officers' testimony requires a credibility assessment. The district court was in the best position to evaluate the credibility of the witnesses and was free to disbelieve Cuevas's testimony. *Turner v. State*, 252 S.W.3d 571, 580 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). Giving the district court's credibility assessment the deference it is due, we find no abuse of discretion in the district court's resolution of the above conflicts in the evidence.[7]

Viewing the evidence in the light most favorable to the district court's ruling, we conclude that the district court did not abuse its discretion in finding that the circumstances surrounding the second interview, as described by Richardson and Sabino, would not cause a reasonable person to believe that his freedom of movement was restrained to the degree associated with a formal arrest. *See Herrera*, 241 S.W.3d at 525; *Stone v. State*, 583 S.W.2d 410, 413 (Tex. Crim. App. 1979); *see also Shaw v. State*, No. 03-08-00506-CR (Tex. App.—Austin July 3, 2009, no pet. h.) (in case involving similar facts, concluding that record supported finding

---

[7] In its ruling at the suppression hearing, the district court explained,

I cannot possibly grant your motion [defense counsel], having listened to the testimony of the officers, watching these tapes, and the DVD, it appears to me that the law enforcement officers tried in a myriad of ways to make sure that he understood what was being explained to him. And although he did at some times seem to be having problems hearing, I believe that the officers took every step that they could to make sure that he understood. He seemed to have remarkable clarity at times after he proclaimed not to be able to hear.

13

that defendant was not in custody because officer testified that defendant was free to leave even after polygraph exam ended). Accordingly, the record supports the district court's determination that Cuevas was not in custody when he made the unrecorded statements.

Moreover, even if the unrecorded statements were obtained as a result of custodial interrogation, we would find any error in their admission harmless. The admission of statements taken in non-compliance with article 38.22 is non-constitutional error. *Nonn v. State*, 117 S.W.3d 874, 881 (Tex. Crim. App. 2003). Accordingly, we must disregard the error unless it affects Cuevas's substantial rights. *See* Tex. R. App. P. 44.2(b). A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Woods v. State*, 152 S.W.3d 105, 118-19 (Tex. Crim. App. 2004).

Here, in addition to the unrecorded statements, the jury also heard the DVD recording in which Cuevas again admitted his guilt. While the English translation of the DVD does not appear in the record,[8] at several points during the interview, Sabino explains to Richardson what he is asking Cuevas and what Cuevas is telling him in response. Sabino told Richardson that Cuevas admitted kissing M.B. and then touching her sexual organ. Later, Sabino told Richardson that Cuevas admitted that the touching was "sexual," and that Cuevas was "sorry that he did it." At

---

[8] Cuevas asserts that during the videotaped interview, he "did not admit anything resembling his alleged statements in the pre-interview." We cannot verify this assertion from the untranslated recording. If Cuevas is relying on the recording to show harm, it was Cuevas's responsibility to ensure that the appellate record contained the translation. *See Word v. State*, 206 S.W.3d 646, 651-52 (Tex. Crim. App. 2006) ("It is usually the appealing party's burden to present a record showing properly preserved, reversible error."); *Rowell v. State*, 66 S.W.3d 279, 282 (Tex. Crim. App. 2001) ("It is no longer necessary, or sufficient, for a party to argue that the appeal should be decided by hypotheses about missing portions of the record."); *Ortiz v. State*, 144 S.W.3d 225, 230 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (holding that appellant has not been relieved of his burden of developing sufficient record in trial court to demonstrate reversible error on appeal).

another point in the recording, in response to a question from Sabino in which Sabino clearly is referring to the female sexual organ and is apparently asking Cuevas where he touched M.B., Cuevas can be seen grabbing his crotch area. Furthermore, in its closing argument, the State referred repeatedly to Cuevas's statements and his actions on the DVD, not to the unrecorded statements about which Sabino testified. On this record, we cannot conclude that the admission of the unrecorded statements had a substantial and injurious effect or influence in determining the jury's verdict. *See Woods*, 152 S.W.3d at 119 (finding no harm when other evidence supported jury's verdict); *Nonn*, 117 S.W.3d at 883 (holding that properly admitted evidence of guilt is one factor to be considered when performing harm analysis under Rule 44.2(b)); *Motilla v. State*, 78 S.W.3d 352, 359 (Tex. Crim. App. 2002) (harm analysis includes whether State emphasized error in its closing argument).

We overrule Cuevas's sole issue.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: July 9, 2009

Do Not Publish