02-10-257-CR and 01-10-258-CR












 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

 

NOS. 02-10-00257-CR
       02-10-00258-CR

 

 


 
 
 CULLEN HORACE MCNAIR
 
 
  
 
 
 APPELLANT
 
 


  

V.

 


 
 
 THE
 STATE OF TEXAS
 
 
  
 
 
 STATE
 
 


 

 

------------

 

FROM THE 371ST
DISTRICT COURT OF TARRANT COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

I. Introduction

         
In three points, Appellant Cullen Horace McNair appeals his two convictions for
aggravated assault with a deadly weapon, to wit:  a motor vehicle.
 We affirm.

II.  Factual
and Procedural History

         
Around 7 a.m. on July 15, 2009, McNair hit John Bird and Jimmy Shook—two union
strikers—with his silver convertible as he drove into work at Bell Helicopter.

         
McNair, age seventy-seven at trial, had been employed for over forty years in
the aerospace industry.[2]
 He spent fifteen of those forty years in engineering at Bell, and he
started working there immediately after he took early retirement from Lockheed,
so that he could continue to care for his wife’s serious medical problems.[3]  On July 15, he went in to work an
hour early.  McNair gave the following testimony about the July 15
incident:

Q.  Now, on this particular day when you came up
to the entrance to Bell Helicopter, the plant itself, was there a line of cars
waiting to get in?

 

A.  No.  There was one car ahead of me . . . more than a car’s length, and
he was going through the picket line, and—but wasn’t all the way through the
line actually at that point.  So when I made my right turn off of Bell
Spur onto the access road to the parking lot, the white line that they picket
next to is just a few yards up from the turn, so, you know, I can’t be going
really very fast as I make a turn and come up there.  And so I went up,
and I thought—I really fully expected that the picketers would just move aside
because that’s the way they had been doing or were open at the other times I
had gone in, and I didn’t know that their—that their philosophy was to stop
each and every car.  So I decided to go on up and just kind of go behind
the car in front of me, tailgate them through there, but I could see that they
weren’t happy with that, so—

 

Q.  Let me ask you this.  How could you tell
that they weren’t happy with you tailgating the other car?

 

A.  Well, of course, they really wanted me to
stop and not try to go through behind the other car.  They wanted to be
able to stop each car in turn and then give permission for it to proceed.

 

Q.  Now, had this been the procedure that you had
run into for the two or three weeks before—

 

A.  No.

 

Q.  –when they were
picketing?

 

A.  No.  In those cases, the police actually
kept the line open, and so I was used to that.[[4]]  And when I—on the morning of my
encounter, they were not that way, and so—but I expected that they would just
move aside.  I didn’t know what their rule was, if you want to call it
that, as far as letting the cars in and out.  But what they like to do is
to stop each and every car and not let two or three cars in, you know, one
right behind the other.

 

Q.  Did you know that at the time?

 

A.  No.  No, I didn’t.  Not until I got
in amongst them.

 

         
. . . .

 

Q.  And when you started through . . . and tried
to inch behind the other vehicle, were there picketers actually in front of
your car by that time?

 

A.  No.  The—I made sure that I got up close
to the car to preclude any of them from trying to jump in front of me. 
They—so then they just surrounded my car, except in the back, but they—they
came up very close to the sides.

 

. . . .

 

Q.  When the—you were trying to drive in and the
picketers came around you, what do you recall exactly happened at that point?

 

A.  Well, it was then that I got—got rather
concerned about trying to get through the line.  Oh, I knew I could get
through the line, but I was—I began to then realize that I was kind of
surrounded by some unhappy folks, and they were slapping the side of my car
with their hand[s], you know, causing no damage but making some racket, and—and
I could hear some abusive language, and then I really got rather
concerned.  You know, I was going—I was driving my car with the top down
that day, so I could see pretty good.  So out of
my peripheral vision on the right-hand side, I saw a man, in my opinion, did a
body slam into my right door.

 

Q.  Well, when you say “body slam into your right
door,” what do you mean?

 

A.  Well, it looked—I could see that he kind of
intentionally reared back and tried to throw his body into the door, and when
he did, he got off balance, and then he went into my rear view mirror and
pushed it forward. . . .  He hit me on the side, on the right side, and
I’m going forward, and they claim that I hit him.

 

. . . .

 

Q.  Did you believe at that time that you had hit
that individual.

 

A.  No.  I didn’t think it was my fault, no.

 

Q.  To this day do you believe that you hit that
individual?

 

A.  I believe—I believe, you know, that we—that I
contacted that individual and that he was injured, and I sincerely regret any
injuries in that incident.  I certainly never ever intended to hurt
anybody on purpose.  I’m not that way.  I’m a Christian.  I’m a
member of a religious organization, and that’s why I wear black, in case
anybody’s wondering about that.  I’m a Benedictine.

 

. . . .

 

Q.  When the strikers reacted, did you have any
anticipation or thought that that would be their reactions?

 

A.  No, I did not.  Not until they hit—not
until that person hit my car.  And then—and then there were placards that
were being waved around, and some even made a mark on my car.  But then I
became concerned that I might get hit because, like I say, the top’s down on my
car, and I began to get a little afraid.  At that point, then I became a
little angry.[[5]]

 

. . . . 

 

Q.  Did you at some point check your vehicle to
see if there was any kind of damage to it?

 

. . . . 

 

A.  There . . . wasn’t.  I did stop my
vehicle when I was up about maybe 30 yards or so for the purpose of checking to
see if my door was bent in because I really thought it might have been, because
it was really a hard hit.  And so I got out of my car and walked around it
and looked.  The door was okay.  There wasn’t any damage.  The
rear view mirror was pushed forward.  I just clicked it in position, and I
went back around and got in my car and started moving to go to the parking lot.

 

Q.  And at some point in time did you hear
anybody telling you to stop?

 

A.  Only after I was back into my car and started
moving.  Then—then I was almost directly across the street from the police
car.  And the police lady got out of the car and said, “Stop, stop,” and I
did . . . . 

 

Q.  And where did you stop?

 

. . . .

 

A.  Oh, I stopped about—oh, not but about a few
yards up from where the police car was parked.  I didn’t go far. 
Because once they saw I was moving, she hollered “stop” and came over and then
wanted to see my driver’s license, insurance card, and I did, gave that. 
Then she said, “Step out of the car.”  I did.  “Turn around and face
the car.”  I did.  And then she said, “Put your hands behind your
back.”  At that point, I knew I was being arrested, but I had not a clue
why.  So I said, “What’s going on?”  What’s the charge?”  And
the police lady said, “Shut up.  You’ll have your chance before the
judge.”  She said that twice and read me the Miranda act. [[6]]  Yeah.

 

Q.  Do you recall at some point her asking if you
did that intentionally?

 

A.  No.  There was no conversation between
me and that police woman except me saying, “What in the world is this? 
What is the charge,” and her telling me to shut up.

 

Q.  And that point in time, did you have any idea
that you had hit anybody or harmed anybody?

 

A.  I did not.  Well, I knew the man
impacted my car, but I certainly had not a clue that the other gentleman had
his foot run over.  If he had his foot run over,
it must have been pretty close to my car.

 

Q.  And did you—do you still believe that you
actually hit the guy, or do you believe that the guy jumped onto you?

 

A.  No.  I’m still thoroughly convinced that
he reared back and then threw his body into the side of my car.  They were
really upset that I was moving through the line.

 

         
McNair said that there were three streaks on his hood that had been left by the
strikers’ placards, and photographs of the streaks were admitted in
evidence.  He said that he never had any intent to injure or hurt anybody
and that he would not intentionally hit someone to get a person out of his way.
 McNair also stated that he was not in a hurry and that he did not become
angry until Shook body-slammed his car.  He denied accelerating or jerking
his wheel but said that once the strikers became aggressive, he was anxious to
get out of there.

         
Fort Worth Police Detective Patsy Miller testified that she met with McNair at
her office after the incident and read him his Miranda warnings.
 After McNair waived his rights, he dictated his statement to Detective
Miller’s partner, who wrote out the statement for him because his hands were
shaking and he was too upset to write, and then McNair signed it.
 Detective Miller read McNair’s statement to the jury:

         
Starting time, 8:18.  Date, 7/15/09.  My
name is Cullen McNair.  I am 76 years of age.  . . .
I have completed 16 years of schooling.  I can read, write, and
understand the English language.

 

         
I was making a right turn off Bell Spur onto the property.  There was a
picket line of two or three lines abreast.  Car ahead of me went
through.  They parted.  I came right behind that car.  As I got
even with the line, they started slapping side of car.  A man on the right
intentionally bumped my car and hit mirror, moving it.  I was creeping
along, accelerated to go up the hill.  They were harassing and giving me a
hard time, slapping my car.

 

         
A FW policeman was coming down the hill, told me to pull over.  Officer
came up to the car, asked for my driver’s license and insurance.  I didn’t
strike anyone I know of.  Officers had me lean against car, then handcuffed me.  A lot of police cars showed up.

 

         
I don’t think I have any witnesses.  I think they were being aggressive
and harassing me.  It was quick.  Just bam bam.  I went through.  They took my
company badge and card.

 

During cross-examination, Detective Miller
stated that McNair told her numerous times that he did not hit anybody with his
car and that the first he knew of it was when he was at the police station.
 She recalled telling him that he hit someone and that he said to her, “I
didn’t hit anybody that I know of.”

         
Shannon Dyer, one of Bell’s security guards, testified that on July 15, he
arrived at the gate around 6:51 a.m. and saw several strikers.  There was
a car in front of him and the strikers held it up for around thirty seconds
before allowing it to pass.  They parted for him when they saw his
uniform.  Dyer observed that the situation was tense because the strike
had gone on for so many weeks, and more strikers were there that morning than
usual, although he did not see any yelling or aggression by the strikers.

         
Dyer did not recall if anyone was behind his vehicle.  He had gone past
the picket line and three-quarters up a hill to his parking spot when he heard
an engine race and then a loud thud.  When he looked in his rear view
mirror, he saw two men limping, and he went back to help.  Dyer said that
the vehicle that struck the two men was a silver convertible and that McNair
was the driver.

         
Linda Valentine, who worked for Bell for thirty-six years, testified that she
was behind a little silver convertible on the way into the facility on July 15.
 There were fifteen to twenty strikers outside, walking one by one across
the street; the strikers would allow a car to pass once they finished crossing
to one side, and “then they would cross again, and then another car would go.”
 She said that the strikers did not appear hostile that morning and that
she did not see them attack or damage any vehicles.  Specifically,
Valentine stated that she did not see anyone harass McNair or bump his vehicle,
hit his mirror, or slap the side of his car.  She described the incident
as follows:

[T]he silver car pulled in, and there was a vehicle in
front of him, and, of course, the strikers were walking across, and it’s like
he wasn’t going to wait.  He just kind of—he just jerked the wheel and
went and hit two of them.  And I was behind him, and I just—I couldn’t
believe it.

 

         
Valentine said that McNair had not been tailgating the vehicle in front of his
“because there had been people that crossed in front” of his vehicle.  It
looked to her like McNair was hurrying to get through and that he just jerked
the wheel instead of waiting for the strikers to pass by, but, unlike Dyer, she
did not hear anything from the vehicle.  McNair did not pull over until
the police officer told him to.

         
Fort Worth Police Officer Julie Cox testified that her off-duty job at Bell was
to provide a police presence during a labor strike.  The strikers would
slowly walk back and forth across the street with their signs but were not
allowed to impede traffic.  Incoming cars would pull up, stop and wait a
few seconds for strikers crossing the street, and once there was a break in the
line of strikers, they would drive through.

         
On July 15, Officer Cox did not notice the strikers raise their voices, make
harassing statements, or hit any vehicles.  She was sitting in her parked
patrol car, watching the traffic and strikers and “doing some of [her] real-job
paperwork,” when she saw McNair hit a striker with his silver convertible
sports car.  She did not see anything to suggest that McNair was not in
control of his vehicle, and she described the incident as follows:

         
I saw the protester bounce off of the vehicle, and I actually was in shock
because I’m sitting here going—I’m in a marked car.  I just witnessed an
accident, and I was just shocked.  I was in awe of it, that it had just
occurred in front of me.  The speed it occurred almost seemed slow motion,
and as it happened, the vehicle starts coming in the direction I’m coming, so
I—you know, I know now that I have to get that vehicle stopped to make sure
that he didn’t drive away.  So I quickly exit my vehicle, run after the
silver vehicle to try to get it stopped.

 

. . . .

 

         
. . . After I ran after it and was trying to gain the
attention of the driver, I was able to get the vehicle stopped.  I
approached the vehicle, and I asked the driver for his driver’s license because
I knew that A, I was able to identify him even if the driver left.

 

. . . . 

 

         
. . . I knew that my primary duty was to make sure
that whoever it was that was injured, that we got medical attention to them . .
. so I quickly ran over to the—the pedestrians or the strikers that had been
struck to make sure.  Initially, I thought it was just one.

 

         
Officer Cox took McNair’s driver’s license before going to check on the injured
man; she discovered two injured people—Shook and Bird.  She called an
ambulance for them and then ran back to McNair.  Officer Cox stated that
until she spoke with McNair, she had believed the incident to have been an
accident.

         
Before trial, the trial court held a hearing regarding whether McNair was in
custody when Officer Cox asked him, “Did you intend to do this?  Was this
an accident?”  Officer Cox said that she asked McNair these questions
after taking his driver’s license from him and telling him he needed to wait
until she checked on the injured, and she said that she asked him this without
giving him his Miranda warnings.  Officer Cox said that McNair
replied, “Yes, because they wouldn’t let me get into work.”  She also
stated that McNair was not in custody at the time—although he was not free to
leave—and that she did not arrest him until after he responded to her question.
 Officer Cox admitted that she took McNair’s driver’s license and never
returned it to him.  The trial court found that McNair was not in custody
at the time and overruled the objection.

         
Before the jury, Officer Cox testified that she asked McNair, “[I]f he intended
to do that, if it was an accident,” and said that he replied, “[Y]es, because they wouldn’t let me get into work.”  She
took his statement as an admission of intent and placed him under arrest for
aggravated assault.  Officer Cox stated that a motor vehicle is capable of
causing death or serious bodily injury.  She did not remember seeing any
scratches on or damage to McNair’s car.

         
Shook testified that he had worked for Bell Helicopter for twenty-three years
and that he had been asked by his union to walk picket duty on July 15.
 Shook said that none of the strikers touched any of the vehicles, that
they only allowed traffic to back-up two or three cars deep, and that they did
not delay the cars’ drivers from getting to work.

         
Shook said that he had been walking back and forth, carrying a sign; when he
was around two-thirds of the way across the intersection, McNair gunned the
motor of his car and hit him and Bird.  Shook said that when McNair’s car
caught him on his left hip, he dropped his picket sign and went to the
ground.  He was stunned, scared, hurt, and very surprised that he had been
hit.  He hobbled to the curb and sat down while the silver convertible
drove on, chased by Officer Cox.  Shook did not recall McNair tailgating
the car in front of him, and he denied that the strikers had hit McNair’s car
with their placards.  He did not know if McNair sped up to hit him.

         
Bird testified that he had worked for Bell Helicopter for almost six years and,
like Shook, his union had asked him to walk picket duty on July 15.  Bird
said that the strikers would not delay vehicles very long, just “slow them up a
little bit.”  Bird gave the following testimony about the incident:

I noticed this small car sitting there with a
gentleman in front of it who didn’t look very happy, and like I said, I just
glanced at him for a second, and I thought, “That man is not happy,” you know,
about going to work or whatever.  But, anyway, I turned around and took
the last few steps, and I don’t remember exactly how long it was, but it wasn’t
maybe five or ten seconds later, if that long, I heard an engine get gunned,
and then the next thing I knew I was getting hit.

 

He identified McNair as the driver of
the car that hit him.

         
Bird could not recall if he was carrying a sign that morning, but he said that
McNair hit him on his left side and spun him around, and then McNair’s right
rear tire drove over the top of Bird’s left foot, which hurt.  Shook was
on the ground not too far from him.  Bird did not recall anyone striking
McNair’s car with signs or yelling at McNair that two cars could not pass
through, and he did not recall seeing any scratches on the hood of McNair’s
vehicle.  Bird said that McNair must have been negligent because he had
hit him and Shook, and he and Shook filed a civil negligence suit against
McNair.

         
In separate indictments, McNair was charged with intentionally or knowingly
causing bodily injury to Shook and Bird by driving into or over them with his
vehicle, or by recklessly causing bodily injury to them by failing to properly
control his vehicle and driving into or over them, and that he used a deadly
weapon during the assault, to-wit:  a motor vehicle that in its manner of
use or intended use was capable of causing death or serious bodily injury.
 See Tex. Penal Code Ann. § 22.02(a)(2)
(West 2011).  McNair filed a motion to quash the recklessness allegation,
which the trial court denied after a hearing.

         
The jury found McNair guilty in both cases, assessed two years’ confinement in
each case, and recommended the imposition of community supervision.  The
trial court entered judgment on the sentences, then suspended them, and placed
McNair on two years of community supervision in each case.  These appeals
followed.

III. Sufficiency

         
In his third point, McNair argues that the evidence is insufficient to convict
him of aggravated assault in each case.  However, because we measure the
sufficiency of the evidence by the elements of the offense as defined by the
hypothetically correct jury charge—i.e., one that accurately sets out the law
and is authorized by the indictment, among other requirements—we will review
McNair’s first point regarding the sufficiency of the indictment before
reviewing the sufficiency of the evidence.  See Hardy v. State, 281
S.W.3d 414, 421 (Tex. Crim. App. 2009); see also
Villarreal v. State, 286 S.W.3d 321, 327 (Tex.
Crim. App.), cert. denied, 130 S. Ct. 515 (2009); Malik
v. State, 953 S.W.2d 234, 240 (Tex. Crim. App.
1997).

A. Indictment

         
In his first point, McNair complains that the trial court erred by overruling
his motion to quash the indictment because it failed to allege with reasonable
certainty the act or acts relied upon to constitute recklessness.

         
We review de novo a trial court’s decision to deny a motion to quash an
indictment.  Lawrence v. State, 240 S.W.3d
912, 915 (Tex. Crim. App. 2007), cert. denied, 553 U.S. 1007
(2008).  A motion to quash should be granted only when the language
concerning the defendant’s conduct is so vague or
indefinite as to deny the defendant notice of the acts he allegedly
committed.  Miller v. State, 333 S.W.3d
352, 356 (Tex. App.—Fort Worth 2010, pet. ref’d) (citing DeVaughn
v. State, 749 S.W.2d 62, 67 (Tex. Crim. App.
1988)).  Further, while the State need not allege facts that are merely
evidentiary in nature, see id., “[w]hen it is alleged that the accused
acted recklessly, [a]rticle 21.15 of the Texas Code
of Criminal Procedure requires additional language in the charging
instrument.”  State v. Rodriguez, 339 S.W.3d
680, 682 (Tex. Crim. App. 2011); see also Tex. Code Crim. Proc. Ann. art. 21.15 (West 2009).

         
The “acts” constituting recklessness under article 21.15 are really the
circumstances surrounding the act, from which the trier of fact may infer that
the accused acted with the required recklessness.  Rodriguez, 339 S.W.3d at 683 (discussing Smith v. State, 309 S.W.3d 10, 15 (Tex. Crim. App. 2010)); see Stadt v. State, 120 S.W.3d
428, 441–43 (Tex. App.—Houston [14th Dist.] 2003) (pet. granted) (op. on reh’g) (stating that the indictment adequately informed
appellant of the acts the State planned to rely upon to constitute
“recklessness” in a manslaughter charge when it stated that he operated his
vehicle at an unreasonable speed, failed to keep a proper lookout, failed to
maintain a single lane of traffic, and changed lanes unsafely), aff’d, 182 S.W.3d 360
(Tex. Crim. App. 2005); see also Crume v. State,
658 S.W.2d 607, 608–09 (Tex. Crim. App. 1983)
(holding that indictment adequately informed appellant of the nature of the
reckless act of which he was accused when it alleged that he caused his vehicle
to collide with the complainant by failing to guide his vehicle away from the
complainant, thereby recklessly causing the complainant’s death); Arredondo
v. State, 582 S.W.2d 457, 458–59 (Tex. Crim. App.
1979) (holding that the indictment was sufficient because it alleged the act
constituting the forbidden conduct and the act demonstrating
recklessness:  recklessly causing victim’s death “by grabbing the steering
wheel of a motor vehicle and pulling said steering wheel to the right . . .
thereby recklessly causing said motor vehicle to veer to the right and strike”
the victim).

         
With regard to reckless conduct, the indictment alleged that McNair committed
the aggravated assaults with a deadly weapon of Shook and Bird by causing them
bodily injury by driving his vehicle into or over them “recklessly, to-wit: by
failing to properly control his motor vehicle.”  [Emphasis added.]
 Because the indictment alleged the circumstance—failure to properly
control his vehicle—that gave rise to the act constituting the aggravated
assault with a deadly weapon—causing bodily injury to Shook and Bird by driving
the vehicle into or over them—we are constrained to conclude that it was
sufficient.  See Crume,
658 S.W.2d at 608–09; Arredondo, 582 S.W.2d at 458–59; see also Rodriguez, 339 S.W.3d at 683; Stadt, 120 S.W.3d at 441–43.

         
Further, we also note that under Crawford v. State, an indictment that
alleges a defendant acted intentionally, knowingly, and recklessly need not
comply with the article 21.15 requirements.  646 S.W.2d
936, 937 (Tex. Crim. App. 1983); see also Bartlett v. State, 249 S.W.3d 658, 672 & n.9, 673
(Tex. App.—Austin 2008, pet. ref’d) (stating that Crawford holds that
article 21.15 governs only when recklessness is the sole culpable mental state
alleged and not when recklessness is alleged along with intentional or knowing
conduct).  Although the indictments here improperly labeled the second
paragraphs of the offenses as “counts,” because they merely added an additional
culpable mental state, they did not allege separate statutory offenses.  See
Tex. Code Crim. Proc. Ann. art. 21.24(a)–(b) (West
2009) (differentiating “counts” for charging separate offenses and “paragraphs”
for charging the same offense); Lebo v. State, 100 S.W.3d
417, 421 (Tex. App.—San Antonio 2002, pet. ref’d) (op. on reh’g)
(stating that “[t]he words ‘intentionally, knowingly, and recklessly’ . . . as
used in the indictment alleging that defendant intentionally, knowingly, or
recklessly injured an elderly person did not constitute three distinct
offenses,” and that adding an additional mental culpable state does not allege
a separate statutory offense); Riley v. State, 658 S.W.2d
818, 819 (Tex. App.—Fort Worth 1983, no pet.) (reciting
that a “count” is used to charge an offense and a “paragraph” is a portion or
subset of a count charging a method of committing that offense, and stating
that a general verdict is proper for a one count indictment alleging multiple
paragraphs).  Therefore, under Crawford, even if the language in
the indictment was not sufficient for recklessness under article 21.15, the
indictments would still be sufficient because they also alleged the intentional
and knowing mental culpable states.  See 646 S.W.2d at 937.  We overrule McNair’s first
point.

B. Aggravated Assault with a Deadly
Weapon

         
In his third point, McNair argues that the evidence is insufficient to support
his convictions for aggravated assault with a deadly weapon because the
evidence shows that he was nothing more than “merely negligent” and that there
was no credible evidence of any reckless conduct on McNair’s part.

         
1. Standard of Review and Applicable Law

         
In our due-process review of the sufficiency of the evidence to support a
conviction, we view all of the evidence in the light most favorable to the
prosecution to determine whether any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt.[7]  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v.
State, 235 S.W.3d 772, 778 (Tex. Crim. App.
2007).

         
A person commits aggravated assault with a deadly weapon if he intentionally,
knowingly, or recklessly causes bodily injury to another and uses or exhibits a
deadly weapon—here, an automobile—during the commission of the assault.  See
Tex. Penal Code Ann. § 22.01(a)(1) (West 2011), § 22.02(a)(2); see also id. § 1.07(a)(17)(B) (West Supp. 2011) (defining “deadly weapon” as
anything that in the manner of its use or intended use is capable of causing
death or serious bodily injury); Drichas v.
State, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005)
(“A motor vehicle may become a deadly weapon if the manner of its use is
capable of causing death or serious bodily injury.”).  A person acts
intentionally when it is his conscious objective or desire to cause the result;
he acts knowingly with respect to the nature of his conduct when he is aware
that his conduct is reasonably certain to cause the result.  See
Tex. Penal Code Ann. § 6.03(a), (b) (West 2011).  In comparison to
these mental states,

[a] person acts recklessly,
or is reckless, with respect to circumstances surrounding his conduct or the
result of his conduct when he is aware of but consciously disregards a
substantial and unjustifiable risk that the circumstances exist or the result
will occur.  The risk must be of such a nature and degree that its
disregard constitutes a gross deviation from the standard of care that an
ordinary person would exercise under all the circumstances as viewed from the
actor’s standpoint.

 

See id. § 6.03(c).

         
2. Analysis

         
McNair admitted that a car can be a deadly weapon and that he was aware of the
proximity of the strikers to his vehicle as he drove through, although he said
that one of the men intentionally “body slammed” his car.  From this, the
jury could have found that he acted recklessly if it also found that he failed
to properly control his vehicle as he drove through.  The jury could have
found lack of proper control from Shook, Bird, and Dyer’s testimonies that
McNair gunned his motor before hitting the strikers and from Valentine’s
testimony that he “just jerked the wheel and went and hit two of them.”
 Further, from the same evidence regarding how McNair gunned his motor and
drove into the two men, the jury could have found that McNair met the
intentional and knowing mental states, supported by Officer Cox’s testimony
that she took McNair’s statement to be an admission that he intended to hit
Bird and Shook because they would not let him into work.  Bird and Shook’s
testimonies establish that each man’s injury was caused by McNair using his
vehicle.

         
Because our sufficiency standard gives full play to the responsibility of the
trier of fact, as the sole judge of the weight and credibility of the evidence,
to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts, we conclude that the
jury could have found beyond a reasonable doubt that McNair committed the aggravated
assault with a deadly weapon of both Bird and Shook.  See Tex. Code
Crim. Proc. Ann. art. 38.04 (West 1979); Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d
at 778; see also Bell v. State, 693 S.W.2d
434, 443 (Tex. Crim. App. 1985) (“[T]he jury, as the sole trier of fact, was
entitled to believe all or part of the conflicting testimony proffered and
introduced by either side.”).  Therefore, we overrule McNair’s third
point.

IV. Custodial Interrogation

         
In his second point, McNair argues that the trial court erred by overruling his
objections to the State’s use of his statement to Officer Cox in response to
her custodial questioning.  Specifically, he complains that he was in
custody when Officer Cox asked him, “Did you intend to do this?  Was this
an accident?” and that, therefore, her testimony about his response—“Yes,
because they wouldn’t let me get into work”—should not have been admitted.

         
During trial, McNair testified that Officer Cox arrested him almost immediately
after she stopped him and he gave her his driver’s license, that she read him
his Miranda rights, and that she did not ask him if he had intentionally
hit anyone or say anything else to him other than “Shut up.  You’ll have
your chance before the judge.”  McNair’s written statement to the police
indicates that Officer Cox asked him for his driver’s license and insurance,
but it does not indicate if or when she asked him the questions at issue here.

         
According to Officer Cox’s testimony during the pretrial hearing and during
trial, McNair was detained but not in custody when she took his license, and
according to McNair’s testimony, he was in custody immediately but was not
asked any questions.  See Dowthitt v. State,
931 S.W.2d 244, 255 (Tex.
Crim. App. 1996).  Assuming without deciding that McNair was in custody
when Officer Cox took his driver’s license and told him to wait for her before
she asked him whether he had intentionally hit the strikers, and that, therefore,
the trial court erred by admitting her testimony about McNair’s statement, we
conclude—as set out in our analysis below—that the error is harmless,
determining beyond a reasonable doubt that the trial court’s admission of the
statement did not contribute to McNair’s conviction or punishment.  See
Tex. R. App. P. 44.2(a); Jones v. State, 119 S.W.3d
766, 776–77 (Tex. Crim. App. 2003) (applying rule 44.2(a) analysis to Miranda
violation), cert. denied, 542 U.S. 905 (2004).

A. Harmless Error

         
In applying the Aharmless error@ test, our primary question is
whether there is a Areasonable possibility@ that the error might have
contributed to the conviction or punishment.  Tex. R. App. P. 44.2(a); Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App.
1998) (op. on reh’g), cert. denied, 526 U.S.
1070 (1999).  Our harmless error analysis should not focus on the
propriety of the outcome of the trial; instead, we should calculate as much as
possible the probable impact on the jury in light of the existence of other
evidence.  Wesbrook v. State, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), cert. denied,
532 U.S. 944 (2001).  We consider a nonexclusive list of factors,
including the nature of the error, whether it was emphasized by the State, the
probable implications of the error, and the weight the jury would likely have
assigned to it in the course of its deliberations.  Snowden v. State,
No. PD-1524-10, 2011 WL 4467280, at *4 (Tex. Crim.
App. Sept. 28, 2011) (“At bottom, an analysis for whether a particular
constitutional error is harmless should take into account any and every
circumstance apparent in the record that logically informs an appellate
determination whether ‘beyond a reasonable doubt [that particular] error did
not contribute to the conviction or punishment.’”).

B. Analysis

         
The alleged error was the admission of McNair’s statement in response to
Officer Cox’s compound question, “Did you intend to do this?  Was this an
accident?”  The first portion of McNair’s response, “Yes,” could answer
either question, but the rest of his response, “because they wouldn’t let me
get to work,” makes clear that he committed an intentional act.  However,
this was not the only evidence of intent admitted during the trial.
 Further, McNair himself testified that he had no intent
to hit anyone nor any knowledge at the time that he had hit anyone but
acknowledged that the strikers had surrounded his car and that a car is capable
of causing death or serious bodily injury.  From this, the jury could have
determined that if he failed to properly control his vehicle when he hit Shook
and Bird, then he had been reckless.  As set out above, the jury also had
sufficient evidence to determine that McNair had failed to properly control his
vehicle based on Valentine’s testimony that he jerked the steering wheel “and
went and hit two of them” from her view in the car behind him.  And
additional evidence besides Officer Cox’s recitation of McNair’s statement to
her supported findings of intent or knowledge.

         
During closing arguments, the State began by telling the jury how to read the
charge and by asking the jurors to “hold Mr. McNair responsible and accountable
for what he did to Jimmy Shook and to John Bird and that you find him guilty of
aggravated assault with a deadly weapon.”  McNair’s counsel then argued
that Officer Cox was not paying attention when the incident occurred because
she had been focusing on her paperwork and that although she testified that
McNair said that he did it because he was trying to get to work, that it was
disputed that McNair even heard her question in light of McNair’s and Detective
Miller’s testimonies.  McNair’s counsel also argued that the streaks on
McNair’s vehicle from the signs showed the chaos that reigned on the picket
line that day and supported McNair’s version of events.  And he argued
that McNair was an old man who did not intend to hurt anyone but who just
intended to get to work—work that he needed to support his disabled wife and
that he would not have endangered because that would have affected his ability
to care for her.  Finally, he pointed out that Shook and Bird admitted
that at best, McNair was negligent, as evidenced by their civil lawsuit against
him.

         
In rebuttal, the State argued that McNair was a selfish man who put getting to
work above the safety of pedestrians, pointing to Valentine’s testimony about
McNair jerking the steering wheel and accelerating and Bird’s testimony that
McNair looked angry before addressing Officer Cox’s statement that McNair said
he did it because the strikers would not let him get to work.  The State
then reiterated Officer Cox’s exact quote before returning to Valentine’s
testimony and then Dyer’s testimony regarding what they saw or heard and that
only McNair claimed that the strikers hit his car with signs and behaved
aggressively.  Therefore, the State did not emphasize Officer Cox’s
testimony until McNair attacked her credibility during his closing argument,
and it emphasized the testimony within the context of the State’s other
witnesses’ testimonies.

         
During its deliberations, the jury sent out two notes.  The first note
indicated that the jurors were deadlocked, six to six.  In the second
note, the foreperson asked, “When reviewing the charges when it say[s] ‘You
should consider the charge as a whole,’ if there is doubt on intent, with
knowledge, can we find him guilty for restlessness [sic] only?”  The trial
court referred the jury back to the charge.  These questions give us a
better idea of the probable weight that the jurors would likely have assigned
the error in the course of its deliberations—that is, they clearly struggled
with a determination of intent despite Shook, Bird, Dyer, Valentine, and
Officer Cox’s testimonies.  And, as set out above, based on the evidence
presented at trial, there was sufficient evidence for the jury to convict him
of aggravated assault with a deadly weapon with a reckless mental state. 
Therefore, we conclude that there is no reasonable possibility that the error
could have contributed to his conviction.  See Mosley, 983 S.W.2d at 259.

         
With regard to whether the error contributed to McNair’s punishment, the State
presented no witnesses during the punishment phase.  McNair presented five
in addition to his own testimony.

         
McNair told the jury that he had never been convicted of any criminal offense
and asked for the minimum sentence and for community supervision.  He told
the jury that he and his wife had been married for thirty-five years, about the
arrangements he had made to take care of her while he worked because she
required “24/7” care, and about his children, who were not responsible and who
would not step up to replace him to take care of their mother if he were sent
to jail.  McNair said that his wife was adamantly opposed to a nursing
home, that he had promised her “a long time ago” that he would take care of her
at home, and that he would probably have to place her
in a nursing home if he went to jail.

         
The other witnesses—Julian Escamilla, John Costanza,
Marie Bell, Donail Williams, and Thomas Reilly—who
had known McNair from two to sixteen years, described McNair as a good,
experienced, talented, helpful, and hard-working person.  Each remarked on
McNair’s wife’s severe physical condition and stated that there would be
absolutely no benefit to society or to McNair for him to go to jail.
 Escamilla stated, “Seventy-seven years of living a good, honest life,
never been in trouble.  No, there’s no benefit.”  Costanza
described McNair as “a contributing person to the community, his church,” and a
“real nice gentleman to be around” who never refused a request for help. 
Bell described McNair’s life as, “He basically does everything.  He leaves
work, goes home, takes care of [his wife], and then comes back to work the next
morning.”  Williams explained that McNair should not be sent to jail,
stating

I know Mack, and I’ve [known] him for a long time, and
Mack will not hurt anyone, you know.  He’s just a very kind person. 
He’s very hard working.  He and I have had many conversations talking
about many different things, and this guy does not have a bone in his body that
would be malice [sic] in any kind of way.  He just—he isn’t that kind of
person.

 

Reilly, McNair’s last witness,
described McNair as “the kind of guy you want to be.  Kind,
religious, helpful, caring, hard working.  Just a
good guy.”  He told the jurors that McNair’s wife needed him at
home and agreed that the defense could take days putting more people on to talk
about McNair because McNair had a lot of very good friends.  All of
McNair’s witnesses asked the jury to consider the minimum sentence and to
recommend community supervision to the trial court.

         
The State waived its opening argument during the punishment phase.  McNair’s
counsel argued that McNair deserved the minimum punishment—two years—and that
the jury should recommend to the trial judge that the sentence in each case be
probated.  He also pointed out that for a man as old as McNair, two years
could very well be a life sentence.  The State then closed by asking the
jury to sentence McNair appropriately “according to the testimony and all the
evidence that you’ve seen in this case.”  The jury sentenced McNair to two
years’ confinement in each case and recommended that the imposition of the
sentences be suspended and that McNair be placed on community supervision, and
the trial court imposed these sentences, suspended them, and put McNair on two
years’ community supervision—the punishment McNair had requested.

         
After carefully reviewing the record and performing the required harm analysis
under rule 44.2(a), we hold beyond a reasonable doubt that the trial court’s
error, if any, by allowing Officer Cox’s testimony about McNair’s response to
her un-Mirandized compound question did not
contribute to McNair’s conviction or punishment.  See Tex. R. App.
P. 44.2(a).  We overrule McNair’s first point.

V.  Conclusion

         
Bearing in mind that we may not substitute our judgment for that of the fact
finder, see Dewberry v. State, 4 S.W.3d 735,
740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000), and
having overruled McNair’s three points, we are constrained to affirm the trial
court’s judgment.

 

 

                                                                            
BOB MCCOY

                                                                            
JUSTICE

 

PANEL:  WALKER, MCCOY,
and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  November 23,
2011














[1]See
Tex. R. App. P. 47.4.





[2]McNair
was the only defense witness during the guilt-innocence phase of trial, and we
begin with his testimony to provide context for the State’s case.





[3]After
several surgeries, McNair’s wife Shirley developed a staph infection that
spread, requiring amputation of her right leg at the hip.  She lost her
left leg to the same infection.  While in intensive care, she suffered a
stroke, leaving her left arm and left hand immobile.  McNair said that he
continued to work to retain health insurance and that he paid someone to care
for his wife while he was at work.  McNair said that he was also
handicapped “to an extent.”





[4]McNair
said that there were more strikers than usual on July 15, and a police car was
“parked up the road probably about 50 yards away,” not down on the picket line
itself.





[5]During
cross-examination, McNair said that he became angry “right after the gentleman
impacted my car on the right side.”  He also acknowledged that a car is
capable of causing death or serious bodily injury.





[6]See
Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).





[7]With
regard to McNair’s first point, addressed below, regarding the admissibility of
Officer Cox’s testimony, we must consider all the evidence admitted at trial,
even improperly admitted evidence, when performing a sufficiency review.  Moff
v. State, 131 S.W.3d 485, 489–90 (Tex. Crim. App.
2004).