# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-17-00637-CR

---

**Martin Morales Chavez, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE COUNTY COURT AT LAW NO. 9 OF TRAVIS COUNTY
### NO. C-1-CR-16-212554, THE HONORABLE KIM WILLIAMS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Following the denial of his pretrial motion to suppress evidence, appellant Martin Morales Chavez pled guilty to driving while intoxicated with an alcohol concentration level of 0.15 or more. *See* Tex. Penal Code § 49.04(a) (defining offense of driving while intoxicated), (d) (elevating offense to Class A misdemeanor if defendant has alcohol concentration level of 0.15 or more). The trial court sentenced appellant to one year in the county jail and imposed a $4,000 fine, *see id.* § 12.21 (establishing punishment range for Class A misdemeanor), but suspended imposition of the sentence and placed appellant on community supervision for eighteen months, *see* Tex. Code Crim. Proc. art. 42A.053(a) (authorizing judge to place defendant on community supervision after guilty plea). In three points of error, appellant challenges the trial court's denial of his motion to suppress evidence. Finding no abuse of discretion in the trial court's ruling, we affirm the judgment of conviction.

## BACKGROUND[1]

On August 27, 2016, at around 12:30 in the morning, Taylor Floyd, a rookie police officer with the Austin Police Department, was on patrol with his field training officer, Adam Curvin, when he observed a black Chevrolet truck passing traffic on Interstate 35 at "a high rate of speed." Using his laser unit to measure the truck's speed, Officer Floyd determined that the truck was going 94 miles per hour while travelling in a 70-mph zone. The officer pulled onto the interstate to follow appellant and initiate a traffic stop for speeding.

During the pursuit, Officer Floyd had to accelerate to speeds of between 110 and 120 miles per hour in order to catch up to the truck. As he followed the truck, the officer observed that the truck was having difficulty maintaining its lane of traffic, crossing over the line on the right side of the lane. When the officers caught up to the truck, Officer Floyd activated his overhead lights. The truck "immediately pulled over." In fact, the truck "jerked over" from his lane to the right shoulder of the interstate, decelerating so quickly that Officer Floyd was forced to stop his patrol car "a few hundred feet" in front of the truck.

The officers exited their patrol car and approached appellant, the driver and sole occupant of the truck. Officer Curvin identified himself to appellant, explained the reason for the stop, and asked appellant, "What's going on?" Appellant explained that he was trying to test the speed of his new truck but indicated that he thought "that's not the right thing to do." Officer Curvin directed appellant to "step out of the car," and appellant complied. The officer asked appellant if he had any weapons on him; appellant denied having any weapons on him. Officer Curvin then handcuffed appellant, telling him that he was "being detained right now."

---

[1] The facts recited are taken from the testimony and evidence presented at the evidentiary hearing on appellant's motion to suppress.

After Officer Curvin had handcuffed appellant, Officer Floyd approached and immediately noticed that appellant had "a strong smell of alcohol on his breath" and that his eyes "were bloodshot and glassy." The officers then saw several weapons in the truck: a knife in the center console and a pistol and rifle (in its case) in the back seat. The officers then began to question appellant about his speeding, his reason for possessing the firearms, where he was coming from, and whether he had been drinking. After a few minutes, however, the officers decided to move appellant from the side of the interstate to a safer location to continue the investigation.

Officer Floyd frisked appellant for weapons, placed him in the patrol car, and, taking the next available exit to leave the interstate, drove appellant to a nearby empty parking lot. After stopping in the parking lot, Officer Floyd removed appellant from the patrol car and took off the handcuffs. The officer then asked appellant the typical questions involved in a DWI investigation, such as where appellant was coming from, what appellant had been drinking, when appellant had been drinking, and how much alcohol appellant had consumed. Officer Floyd then administered a series of field sobriety tests to appellant, including the horizontal gaze nystagmus (HGN) test, the one-leg stand test, and the walk-and-turn test. The officer testified that appellant exhibited all six possible intoxication clues on the HGN test, one clue on the one-leg-stand test, and no clues on the walk-and-turn test. Officer Floyd also administered a portable breath test to appellant, which indicated that appellant had an alcohol concentration of 0.136.

After briefly discussing the results of the field sobriety tests with Officer Curvin, Officer Floyd arrested appellant for driving while intoxicated because, based on the HGN test and his observations of appellant, he believed that appellant had lost the normal use of his mental and physical faculties due to alcohol consumption.

## DISCUSSION

In three points of error, appellant challenges the trial court's denial of his pretrial motion to suppress the evidence resulting from the traffic stop. In his first point of error, he contends that the evidence resulting from his arrest should have been suppressed because Officer Floyd lacked probable cause to arrest him for driving while intoxicated. In his second and third points of error, appellant argues that the statements that he made to the officers during the traffic stop should have been suppressed because they were made as a result of a custodial interrogation that occurred without appellant being given the requisite constitutional and statutory warnings.

### Standard of Review

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). We apply a bifurcated standard of review, *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018); *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016), giving almost total deference to a trial court's findings of historical fact and credibility determinations that are supported by the record, but reviewing questions of law de novo, *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016); *Weems*, 493 S.W.3d at 577. Thus, we review a trial court's application of search and seizure law to the facts de novo. *State v. Ford*, 537 S.W.3d 19, 23 (Tex. Crim. App. 2017); *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011); *see State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008) (distinguishing fact findings from "legal rulings on 'reasonable suspicion' or 'probable cause'" because such rulings are "legal conclusions subject to *de novo* review").

4

In a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Lerma*, 543 S.W.3d at 190; *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). When the trial court does not make explicit findings of fact, as in this case, we view the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact supported by the record. *Lerma*, 543 S.W.3d at 190; *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). In our review, "[t]he prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it." *Matthews v. State*, 431 S.W.3d 596, 601 n.5 (Tex. Crim. App. 2014); *accord Weaver,* 349 S.W.3d at 525.

We overturn the trial court's ruling only if it is arbitrary, unreasonable, or "outside the zone of reasonable disagreement." *Cortez*, 543 S.W.3d at 203; *Dixon*, 206 S.W.3d at 590. Further, we will uphold the ruling if it is correct on any theory of law applicable to the case, *Lerma*, 543 S.W.3d at 190; *Weems*, 493 S.W.3d at 577, even if the trial judge made the ruling for a wrong reason, *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014).

**Probable Cause to Arrest**

In his first point of error, appellant contends that the trial court erred in denying his motion to suppress evidence arising from his arrest because Officer Floyd lacked probable cause to arrest appellant for driving while intoxicated.

An arrest is valid under Texas law if the arresting officer had probable cause with respect to the person being arrested as well as statutory authority to make the arrest. *State v. Martinez*, 569 S.W.3d 621, 628 (Tex. Crim. App. 2019); *Neal v. State*, 256 S.W.3d 264, 280 (Tex. Crim. App. 2008); *see* Tex. Code Crim. Proc. arts. 14.01–14.04. "Probable cause is a fluid

5

concept that cannot be readily reduced to a neat set of legal rules." *Ford*, 537 S.W.3d at 23; *accord Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009); *see Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003) ("[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.") (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "Although the concept evades precise definition, it involves 'a reasonable ground for belief of guilt' that is 'particularized with respect to the person to be searched or seized.'" *Ford*, 537 S.W.3d at 23 (quoting *Baldwin*, 278 S.W.3d at 371); *see Pringle*, 540 U.S. at 371. "It is a greater level of suspicion than 'reasonable suspicion' but falls far short of a preponderance of the evidence standard." *Ford*, 537 S.W.3d at 23–24; *accord Baldwin*, 278 S.W.3d at 371.

Probable cause for a warrantless arrest exists if, at the time the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person to believe that the arrested person had committed or was committing an offense. *State v. Woodard,* 341 S.W.3d 404, 412 (Tex. Crim. App. 2011); *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009); *see Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Martinez*, 569 S.W.3d at 628. "The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer, and it requires a consideration of the totality of the circumstances facing the arresting officer." *Amador*, 275 S.W.3d at 878 (citing *Beck*, 379 U.S. at 97; *Pringle*, 540 U.S. at 371).

In this case, the record reflects that appellant engaged in unlawful and erratic driving. When the officers first observed appellant passing other traffic on the interstate, Officer Floyd's laser unit showed that appellant was going 94 miles per hour in a 70-mph zone—almost 25 miles per hour over the speed limit. During the pursuit, Officer Floyd observed that appellant

6

did not maintain his lane of traffic. When Officer Floyd activated his overhead lights, appellant pulled over in an unsafe manner, suddenly decelerating and "jerking over" to the side of the interstate.[2] In fact, appellant's maneuver was so abrupt, the officer had to pull over in front of appellant's truck. When the officers talked to appellant about his speeding, appellant admitted that he was going 100 miles per hour before being stopped.

Upon contacting appellant, Officer Floyd immediately noticed that appellant had a strong odor of alcohol on his breath and had bloodshot and glassy eyes. Appellant admitted to the officers that he had been drinking alcohol that night. He told them that he had three drinks of Crown Royal—two shots and "an eighter"—with the last drink 20 to 30 minutes before the stop. Appellant also acknowledged the effect of the alcohol on him, admitting that he "did some stupid things because, you know, alcohol, whenever you get some - -." Further, appellant also exhibited signs of intoxication on some of the field sobriety tests, including the portable breath test that indicated an alcohol concentration of 0.136, well in excess of the 0.08 alcohol concentration set by statute. *See* Tex. Penal Code § 49.01(2)(B); *see also Fernandez v. State,* 915 S.W.2d 572, 576 (Tex. App.—San Antonio 1996, no pet.) (portable breath test, given as one of several field sobriety tests, used as qualitative indicator of intoxication).

Thus, several factors in this case support a finding of probable cause. *See Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010) (explaining that "evidence that would logically raise an inference that the defendant was intoxicated" includes, among other things, erratic driving, inability to perform field sobriety tests or follow directions, bloodshot eyes, and

---

[2] Officer Floyd testified that, in his opinion, the abrupt maneuver was unsafe "[b]ecause there was other traffic on I-35 at that time," and "[appellant] could have easily caused an accident by just jerking over and not making sure that the lane was clear beside him," although he conceded that he did not know whether appellant had checked to ensure it was safe to change lanes before abruptly doing so.

7

any admissions by defendant concerning what, when, and how much he had been drinking); *Cotton v. State*, 686 S.W.2d 140, 142 n.3 (Tex. Crim. App. 1985) (listing signs of intoxication, including slurred speech, bloodshot eyes, odor of alcohol on person, unsteady balance, staggered gait, odor of alcohol on breath); *see, e.g.*, *Texas Dep't of Pub. Safety v. Garza*, No. 13-10-00330-CV, 2010 WL 4901406, at *6 (Tex. App.—Corpus Christi Dec. 2, 2010, no pet.) (mem. op.) (including portable breath test results as factor in "totality of the circumstances" evaluation of probable cause); *Ex parte Albright*, No. 02-03-00301-CR, 2004 WL 41403, at *5 (Tex. App.—Fort Worth Jan. 8, 2004, no pet.) (mem. op., not designated for publication) (observing that portable breath tests are treated like other field sobriety tests and can be used in establishing probable cause for arrest); *Texas Dep't of Pub. Safety v. Bond*, 955 S.W.2d 441, 447 (Tex. App.—Fort Worth 1997, no pet.) (portable breath test given at scene was one of several field sobriety tests used to determine probable cause).

In his brief, appellant relies on Officer Floyd's testimony at the suppression hearing that he did not have probable cause to arrest appellant before the field sobriety tests. Appellant maintains that his performance on the field sobriety tests yielded "no new inculpatory information" because the HGN was, according to appellant, improperly administered; appellant exhibited only one of two clues on the one-leg-stand; and he exhibited no clues on the walk-and-turn test. Thus, he challenges "the arresting officer somehow [going] from not having probable cause to believing he had probable cause" after administering these tests. Appellant insists that

> Courts must use some standard by which to evaluate an officer's probable cause
> determination, or else they thoroughly abdicate their supervisory role. If the
> Court cannot take the officer's own word for the belief that probable cause did not
> exist, [appellant] is hard-pressed to come up with any standard that would suffice.

Appellant's argument is flawed for several reasons.

First, the officer's "own word" is not the applicable standard. Officer Floyd's opinion about whether he had probable cause to arrest is irrelevant. As we noted earlier, "[t]he test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer." *Amador*, 275 S.W.3d at 878; *see Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005) ("[P]robable cause must be based on facts, not opinions."). The issue is whether there were objective factors on which Officer Floyd could have reasonably relied that created probable cause for appellant's arrest. Objective facts—rather than the officer's subjective beliefs—drive the analysis.

Second, we should not, as appellant does, look at the facts in existence piecemeal or isolate our review to those facts elicited by or beneficial to the defense. When determining probable cause, an appellate court considers the totality of the circumstances. *Wiede*, 214 S.W.3d at 25; *Dixon,* 206 S.W.3d at 616. This means that a "divide-and-conquer" or piecemeal approach is prohibited. *Wiede*, 214 S.W.3d at 25 (citing *United States v. Arvizu,* 534 U.S. 266, 274 (2002)). By focusing only on what he considers evidence showing a lack of intoxication—the fact that appellant passed one of the field sobriety tests and that the HGN test was, he contends, improperly administered—appellant overlooks or minimizes the significance of the evidence of intoxication that Officer Floyd personally observed and that is reflected in the officer's dash-cam recording of the traffic stop.

The evidence in the record demonstrates that Officer Floyd pursued appellant's truck because the truck was far exceeding the posted speed limit. Before appellant stopped, Officer Floyd observed erratic and unsafe driving that, his testimony reflected, might indicate intoxication—appellant passed the officers and other traffic while speeding, had difficulty

9

maintaining his own lane, and pulled over in an unsafe manner. Once the truck was legally stopped, Officer Floyd observed that appellant exhibited several signs of intoxication, including alcohol on his breath and bloodshot glassy eyes. It was the middle of the night, and appellant admitted that he was coming from a friend's place where he had been drinking whiskey and that his last drink had been only 20 to 30 minutes before driving. Appellant further indicated, when explaining why he was speeding, that alcohol influenced his decision to test how fast his new truck would go. In addition, the portable breath test showed the presence of alcohol in appellant's system with an alcohol concentration above the legal limit. Also, appellant engaged in some unusual or odd behavior during the encounter, including suggesting that the officer drive his truck to test its maximum speed, making insensitive racial comments, laughing inappropriately without cause, and repeating questions that were previously answered. Looking to the totality of the circumstances in this case, there were additional facts—aside from the two field sobriety tests that appellant relies on—that Officer Floyd could have considered in determining probable cause. *See Cotton*, 686 S.W.2d at 142 ("'Evidence of intoxication' encompasses specific conduct that, when combined with other specific conduct which is also evidence of intoxication, leads to the conclusion that a person is intoxicated or is under the influence of alcohol to the degree that he may endanger himself or another.").

"Probable cause deals with probabilities; it requires more than mere suspicion but far less evidence than that needed to support a conviction or even that needed to support a finding by a preponderance of the evidence." *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997); *see Brinegar v. United States*, 338 U.S. 160, 175 (1949). "[I]t is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Gates*, 462 U.S. at 235 (quoting *Spinelli v. United States,* 393 U.S. 410, 419 (1969)).

10

For cases involving driving while intoxicated, there is no requirement that certain "intoxication indicators"—for example, failing field sobriety tests—be present to establish probable cause because the factors may differ in each case. *State v. Tri Minh Tran*, No. 03-13-00016-CR, 2014 WL 4362964, at *2 (Tex. App.—Austin Aug. 27, 2014, no pet.) (mem. op., not designated for publication); *State v. Long,* No. 03-11-00725-CR, 2012 WL 1959316, at *5 (Tex. App.—Austin May 31, 2012, no pet.) (mem. op., not designated for publication); *see Woodward v. State,* 668 S.W.2d 337, 345 (Tex. Crim. App. 1982) (explaining that "[i]t must be kept in mind in reviewing a question of sufficiency of probable cause that such a question is a quintessential example of the necessity for case-by-case determination based upon the facts and circumstances shown").

The facts and circumstances present in this case were sufficient to warrant a prudent person to believe that appellant was intoxicated and had committed the offense of driving while intoxicated. *See* Tex. Penal Code § 49.04. Thus, we conclude that the record supports the trial court's implied conclusion of law that, based on the totality of the circumstances, Officer Floyd had probable cause to arrest appellant for driving while intoxicated. Accordingly, we hold that the trial court did not abuse its discretion in denying appellant's motion to suppress based on appellant's claim that the arresting officer lacked probable cause. We overrule appellant's first point of error.

**Custodial Interrogation**

In his next two points of error, appellant challenges the trial court's refusal to suppress the statements that he made to the police officers during the traffic stop, asserting that they were the result of a custodial interrogation and, thus, were inadmissible because he had not

11

been given the requisite constitutional and statutory warnings. In his second point of error, he argues that the trial court erred in denying his motion to suppress because he was subjected to a custodial interrogation in violation of his constitutional rights under *Miranda* and the Fifth Amendment and, therefore, his statements should have been suppressed. Similarly, in his third point of error, he maintains that the trial court erred in denying his motion to suppress because he was subjected to a custodial interrogation in violation of his statutory rights under article 38.22 and, therefore, his statements should have been suppressed.

The Fifth Amendment privilege against self-incrimination prohibits the government from compelling a criminal suspect to bear witness against himself. *Pecina v. State*, 361 S.W.3d 68, 74–75 (Tex. Crim. App. 2012) (citing U.S. Const. amend. V); *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In *Miranda v. Arizona*, the United States Supreme Court crafted safeguards to protect the privilege against self-incrimination in the inherently coercive atmosphere of custodial interrogations. *Pecina*, 361 S.W.3d at 75 (citing *Miranda*, 384 U.S. at 441). Texas has incorporated the requirements of *Miranda* into article 38.22 of the Code of Criminal Procedure, which sets out specific warnings that must be provided to an accused during a custodial interrogation. *See* Tex. Code Crim. Proc. art. 38.22, §§ 2–3. Both *Miranda* and article 38.22 require that the accused be properly admonished of certain constitutional rights for any statements "stemming from custodial interrogation" to be admissible as evidence against him. *See Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. art. 38.22, §§ 2–3.

However, "[t]he warnings required by *Miranda* and article 38.22 are intended to safeguard a person's privilege against self-incrimination *during custodial interrogation*." *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009) (emphasis added); *see Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) (explaining that *Miranda* warnings

12

"safeguard an uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation"). Thus, the warnings set out in *Miranda* and article 38.22 are required only when a person is subjected to "custodial interrogation." *See Miranda*, 384 U.S. at 442–57, 467–79 (warnings apply only to use of statements obtained from suspect during police-initiated "custodial interrogation"); Tex. Code Crim. Proc. art. 38.22, §§ 2–3 (setting out requirements for admissibility of defendant's statement resulting from "custodial interrogation"). The defendant bears the burden of establishing that a statement was the product of a custodial interrogation. *Gardner*, 306 S.W.3d at 294; *Herrera*, 241 S.W.3d at 526; *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005).

Under *Miranda*, "custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. What constitutes "custodial interrogation" under article 38.22 is the same as it is under *Miranda* and the Fifth Amendment. *Thai Ngoc Nguyen v. State*, 292 S.W.3d 671, 677 n.27 (Tex. Crim. App. 2009); *see Bass v. State*, 723 S.W.2d 687, 691 (Tex. Crim. App. 1986) (court's construction of "custodial interrogation" for purposes of article 38.22 was consistent with meaning of "custodial interrogation" under Fifth Amendment). Thus, the concerns raised by a failure to comply with *Miranda* or article 38.22 arise G18only when the individual is subject to both (1) custody by a law enforcement officer and (2) an interrogation. *See Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. art. 38.22, §§ 2–3. The question here, then, is whether appellant was in custody during the traffic stop such that the questioning by the officers amounted to a custodial interrogation.

13

As a general rule, persons temporarily detained pursuant to an ordinary traffic stop are not "in custody" for purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012); *see Howes v. Fields*, 565 U.S. 499, 510 (2012) (reaffirming that "temporary and relatively nonthreatening detention involved in a traffic stop" "does not constitute *Miranda* custody"). Thus, a traffic stop that includes questioning and field sobriety tests does not, without more, rise to the level of a custodial interrogation. *Berkemer*, 468 U.S. at 440–42; *State v. Stevenson*, 958 S.W.2d 824, 828–29 (Tex. Crim. App. 1997). However, while a routine traffic stop generally does not place a person in custody for *Miranda* purposes, a traffic stop may escalate from a noncustodial detention to a custodial detention when the detainee's freedom of movement is restrained to the degree associated with a formal arrest. *Ortiz*, 382 S.W.3d at 372; *State v. Dewbre*, No. 03-15-00786-CR, 2017 WL 3378882, at *5 (Tex. App.—Austin July 31, 2017, pet. ref'd) (mem. op., not designated for publication).

"We evaluate whether a person has been detained to the degree associated with arrest on an ad hoc, or case-by-case, basis." *Ortiz*, 382 S.W.3d at 372; *accord Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). In making a custody determination, the primary question is whether a reasonable person would perceive the detention to be a restraint on his or her movement comparable to formal arrest, given all the objective circumstances. *Ortiz*, 382 S.W.3d at 372 (citing *Berkemer*, 468 U.S. at 441); *see Stansbury v. California*, 511 U.S. 318, 323 (1994); *see also Herrera*, 241 S.W.3d at 532 ("We evaluate 'custody' 'on an ad hoc basis, after considering all of the (objective) circumstances' and apply the 'reasonable person' standard." (quoting *Dowthitt*, 931 S.W.2d at 254–55)). We look only to the objective factors surrounding the detention; the subjective beliefs of the detaining officer or person being

14

questioned are, generally, not included in the calculation of whether a person is in custody. *Ortiz*, 382 S.W.3d at 372–73; *Dowthitt*, 931 S.W.2d at 255; *see Stansbury*, 511 U.S. at 323. However, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Stansbury*, 511 U.S. at 325; *accord Anderson v. State*, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996). Such beliefs are relevant "to the extent that they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Stansbury*, 511 U.S. at 325.

Texas courts consider several factors when categorizing the seizure of a person,[3] including the amount of force displayed, the duration of detainment, the efficiency of the investigative process, whether the investigation is conducted at the original location or the person is transported to another location, the officer's expressed intent—that is, whether the officer told the person that he was under arrest or was being detained, and any other relevant factors. *Sheppard*, 271 S.W.3d at 290; *Harris v. State*, No. 03-16-00330-CR, 2017 WL 6273221, at *4 (Tex. App.—Austin Dec. 7, 2017, pet. ref'd) (mem. op., not designated for publication). In general, "[i]f the degree of incapacitation appears more than necessary to simply safeguard the officers and assure the suspect's presence during a period of investigation, this suggests the detention is an arrest." *Sheppard*, 271 S.W.3d at 291; *accord Harris*, 2017 WL 6273221, at *4. Conversely, a seizure is an investigative detention rather than an arrest, if, given the totality of the circumstances, "a reasonable person would believe the seizure was to be sufficiently

---

[3] Both investigative detentions and arrests are seizures under the Fourth Amendment. *State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011); *Crain v. State,* 315 S.W.3d 43, 49 (Tex. Crim. App. 2010).

nonintrusive as to be only an 'investigative detention.'" *Sheppard*, 271 S.W.3d at 291 (citing 40 George E. Dix and Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 7.34 (2d ed. 2001)).

Citing the length of his detention, the fact that he was handcuffed, and the fact that he was moved to another location, appellant argues that the degree of his restraint would have caused a reasonable person to believe that his freedom of movement was restrained to the degree associated with a formal arrest. He claims that he was "completely at the mercy of the police," that this was "not a simple roadside detention with a few routine questions," and that his detention was not a "brief and temporary" traffic stop.

The length of the detention may render a traffic stop unreasonable. *Balentine v. State*, 71 S.W.3d 763, 770 (Tex. Crim. App. 2002). However, while the brevity of the intrusion on the detained individual's Fourth Amendment interests is an important factor, courts "have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe,* 470 U.S. 675, 685 (1985); *accord Hartman v. State*, 144 S.W.3d 568, 572 (Tex. App.—Austin 2004, no pet.). There is no arbitrary time limit beyond which a traffic stop becomes unreasonably long. *Sharpe,* 470 U.S. at 685; *see Kothe v. State*, 152 S.W.3d 54, 64 (Tex. Crim. App. 2004) (recognizing that Supreme Court "has expressly rejected placing any rigid time limitations" on traffic stops); *Balentine,* 71 S.W.3d at 770 (observing that "there is no 'bright line' time limit" for traffic stops). Instead, common sense and ordinary human experience must govern over rigid criteria. *Sharpe,* 470 U.S. at 685; *Hartman*, 144 S.W.3d at 572; *see Balentine,* 71 S.W.3d at 770; *Rhodes v. State*, 945 S.W.2d 115, 118 (Tex. Crim. App. 1997). The reasonableness of the detention depends on whether the police diligently pursued a means of

16

investigation that was likely to dispel or confirm their suspicions quickly, during which time it was necessary to detain the defendant. *Sharpe,* 470 U.S. at 685; *Kothe,* 152 S.W.3d at 64; *Balentine,* 71 S.W.3d at 770.

In the present case, the record reflects that appellant's detention lasted approximately twenty-eight minutes.[4] The video recording of the traffic stop combined with Officer Floyd's testimony essentially provide a minute-by-minute account of the activities following the stop. Officer Floyd initially stopped appellant for excessively speeding, pulling him over on the side of the interstate. Upon contacting appellant, the officers immediately noticed signs of intoxication and, within two minutes, saw various weapons in his truck. After talking to appellant for approximately five minutes—questioning him about his speeding, the weapons in his truck, and, to a lesser extent, his drinking—the officers determined that the location was neither safe nor suitable for field sobriety tests and decided to move to a safer location. Appellant was placed in the patrol car, which Officer Floyd drove to the empty parking lot, taking the first available exit off of the interstate. The time stamps on the video recording reflect that the drive took less than two minutes. Appellant was removed from the car, and

---

[4]    In his brief, appellant asserts that his detention lasted "for more than a half hour." His calculation appears to include the initial pursuit depicted on the dash-cam video recording (before appellant pulled over) as well as the period after appellant was formally arrested for DWI, during which time the officers completed several administrative tasks associated with the arrest, including retrieving appellant's personal property from his truck, obtaining his truck keys from him, and arranging for the truck to be towed. For purposes of our analysis, we consider only the period from when the officers first made contact directly with appellant after pulling him over until he was formally arrested.

17

Officer Floyd took off the handcuffs. The remainder of the detention involved typical DWI related questions and the administration of the field sobriety tests.[5]

The evidence shows that the officers diligently pursued their investigation— starting with the issue of appellant's speeding and continuing with the developing issues of his intoxication and possession of weapons, s*ee Glazner v. State*, 175 S.W.3d 262, 265 (Tex. Crim. App. 2005) (affirming that "a police officer is permitted to broaden the line of questioning beyond the scope of the original subject matter if he or she notices additional suspicious factors")—and that appellant's detention lasted no longer than was reasonably necessary to effectuate the purposes of the stop. The record does not reflect that the officers engaged in any unnecessary activity or dilatory tactics. Under the circumstances reflected here, the length of the detention was reasonable. *See Matthews,* 431 S.W.3d at 603 (observing that "temporary detention may continue for a reasonable period of time until the officers have confirmed or dispelled their original suspicion of criminal activity").

Further, when conducting a traffic stop, "officers may use such force as is reasonably necessary to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety." *Rhodes*, 945 S.W.2d at 117; *accord Sheppard*, 271 S.W.3d at 291 n.37; *Koch v. State*, 484 S.W.3d 482, 489 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Bartlett v. State*, 249 S.W.3d 658, 669 (Tex. App.—Austin 2008, pet. ref'd); *see United States v. Sokolow,* 490 U.S. 1, 10 (1989) (observing that police are not required to use "least intrusive means" to verify or dispel their suspicions and concluding that officers were not unreasonable in forcibly detaining defendant). Whether such use of force elevates the detention to custody or an arrest

---

[5] The record reflects some of this time included time that Officer Floyd briefly consulted with Officer Curvin, his field training officer.

turns on the reasonableness of the intrusion under all of the facts. *Bartlett*, 249 S.W.3d at 669; *State v. Moore*, 25 S.W.3d 383, 386 (Tex. App.—Austin 2000, no pet.). Factors that may be considered in this inquiry include the degree of force employed, the nature of the crime under investigation, the degree of suspicion, the location of the detention, the time of day, the reaction of the suspect, and whether the officer actually conducts an investigation. *Bartlett*, 249 S.W.3d at 669; *Moore*, 25 S.W.3d at 386.

In this case, when the officers first made contact with appellant, Officer Curvin told him to get out of his truck; appellant complied. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 & n.6 (1977) (concluding that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures"); *O'Hara v. State*, 27 S.W.3d 548, 553 (Tex. Crim. App. 2000) (recognizing that "a police officer can, as a matter of routine, order a suspect out of his car during a traffic stop"). Appellant was then almost immediately handcuffed. Although handcuffing a suspect is not ordinarily proper during an investigative detention, it may be resorted to when reasonably necessary to effect the goal of the detention: investigation, maintenance of the status quo, or officer safety. *Campbell v. State*, 325 S.W.3d 223, 234 (Tex. App.—Fort Worth 2010, no pet.); *Moore,* 25 S.W.3d at 386. An individual may be placed in handcuffs, especially for safety purposes, to further the purpose of the investigatory stop. S*ee Rhodes,* 945 S.W.2d at 117–18. No bright-line rule establishes that mere handcuffing is always the equivalent of an arrest. *Balentine*, 71 S.W.3d at 771; *Rhodes,* 945 S.W.2d at 118; *Moore,* 25 S.W.3d at 386; *see Ortiz,* 382 S.W.3d at 374 (recognizing that handcuffing is not conclusive indicator of custody for Fifth Amendment purposes, but merely relevant factor in determination).

At the suppression hearing, Officer Floyd testified that appellant was handcuffed "to ensure the safety of [Officer Floyd] as well as [his] field training officer and the driver at that point." Appellant argues that the "officer safety" reason (for both handcuffing and moving appellant to another location) was "a pretext" because Officer Floyd acknowledged on cross examination that appellant had not taken any actions that made the officer feel unsafe. However, "officer safety" is but one reason a detained individual may be handcuffed.[6] *See Rhodes*, 945 S.W.2d at 118 (explaining that "officers may use such force as is reasonably necessary to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety"). The record demonstrates that, during the detention, appellant was only handcuffed until the officers moved him to a safe location to continue the investigation. Thus, the record supports an inference that the handcuffs were used to maintain the status quo. Moreover, when considering the entirety of the detention, the record reflects that appellant spent more time not restrained by handcuffs than handcuffed.

An important consideration in evaluating the reasonableness of force used is whether the officer actually conducts an investigation after seizing the suspect—that is, whether the officer makes reasonable inquiries of a truly investigatory nature as contemplated by *Terry v. Ohio. Campbell*, 325 S.W.3d at 234; *see Hartman*, 144 S.W.3d at 572 ("An investigative detention requires an actual investigation; where no investigation is undertaken, the detention cannot be considered investigatory and rises to the level of an arrest."); s*ee e.g.*, *Amores v. State*, 816 S.W.2d 407, 412 (Tex. Crim. App. 1991) (observing that "no such investigation was conducted and the detention can by no means be characterized as investigatory"). Here, as noted

---

[6] Appellant does not address the officer's testimony that the handcuffing was to ensure driver safety.

previously, the officers diligently conducted their investigation addressing the issues—appellant's excessive speeding, appellant's possession of weapons, and appellant's intoxication—as they arose.

As for moving appellant to a different location, the record indicates appellant was taken from the side of a busy interstate, with high-speed traffic flowing in close proximity, to a nearby empty parking lot to allow Officer Floyd to administer the field sobriety tests in a safer location. Moving a suspect a short distance to further an investigation is consistent with an investigatory detention's purpose. *Castro v. State,* 373 S.W.3d 159, 166 (Tex. App.—San Antonio 2012, no pet.); *see, e.g.*, *Florida v. Royer*, 460 U.S. 491, 504 (1983) ("[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention."); *Josey v. State*, 981 S.W.2d 831, 841 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) ("Safety and security reasons may justify moving a suspect from one location to another during an investigatory stop."); *compare Francis v. State,* 922 S.W.2d 176, 180 (Tex. Crim. App. 1996) (Baird, J., concurring and dissenting) (moving individual short distance to scene of crime furthered investigation), *with Delk v. State,* 855 S.W.2d 700, 712 (Tex. Crim. App. 1993) (determining that arrest occurred where suspects were "handcuffed, read their *Miranda* rights, and taken to police station"). Officer Floyd's transportation of appellant a short distance—from an unsafe high-traffic location to a safe empty parking lot—reasonably furthered the investigation while providing for officer and driver safety.

Finally, we must examine the officers' communicated intent with regard to the detention in question. *Sheppard,* 271 S.W.3d at 291; s*ee Bartlett*, 249 S.W.3d at 669 (noting that subjective view of officer regarding custody may be relevant as circumstance of interrogation if conveyed to individual being questioned to extent that communication of officer's view would

21

affect reasonable person's understanding of freedom of action) (citing *Stansbury,* 511 U.S. at 325; *Dowthitt,* 931 S.W.2d at 254; *Houston v. State*, 185 S.W.3d 917, 920 (Tex. App.—Austin 2006, pet. ref'd)). At the suppression hearing, Officer Floyd testified that appellant was not in custody or under arrest but only was detained. The record reflects that this intent to detain was communicated to appellant. When Office Curvin handcuffed appellant, he explicitly told appellant that he was "being detained right now," and appellant responded, "Yes." Only at the conclusion of the administration of the field sobriety tests and after consultation with Officer Curvin did Officer Floyd formally arrest, and re-handcuff, appellant, telling him that he was "being placed under arrest for driving while intoxicated."

"[I]n evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685; *accord Balentine*, 71 S.W.3d at 771; *Rhodes*, 945 S.W.2d at 118. "'Reasonableness' must be judged from the perspective of a reasonable officer at the scene, rather than with the advantage of hindsight." *Rhodes*, 945 S.W.2d at 118; *Cano v. State*, No. 03-15-00485-CR, 2017 WL 3908640, at *8 (Tex. App.—Austin Aug. 24, 2017, pet. ref'd) (mem. op., not designated for publication). "Furthermore, allowances must be made for the fact that officers must often make quick decisions under tense, uncertain[,] and rapidly changing circumstances." *Rhodes*, 945 S.W.2d at 118; *Cano*, 2017 WL 3908640, at *8; *Bartlett*, 249 S.W.3d at 669. Consequently, there may be circumstances in an investigative detention that reasonably justify an officer handcuffing a suspect, placing a suspect in a police car, or transporting the suspect to another location for questioning. *Bartlett*, 249 S.W.3d at 669 (internal citations omitted). Thus, to determine whether an individual is in custody for *Miranda* purposes, courts must consider "the

reasonableness of the intrusion under all the facts." *Bartlett*, 249 S.W.3d at 669; *Moore*, 25 S.W.3d at 386.

Although the record in this case reflects that appellant's freedom was restricted by the officers' actions, for a person to be considered "in custody," as opposed to merely subject to an investigative detention, "the restriction on a suspect's freedom of movement must reach 'the degree associated with an arrest' instead of an investigative detention." *See State v. Saenz*, 411 S.W.3d 488, 496 (Tex. Crim. App. 2013). Under the circumstances reflected in the record here, the degree of appellant's restraint was no more than necessary to effect the traffic stop and maintain the status quo in order to safely conduct the ensuing investigation while assuring appellant's presence during the period of investigation.

After reviewing the evidence under the appropriate standard of review, we conclude that, under the facts of this case, the trial court's implied conclusions—that appellant's traffic stop was an investigatory detention and that appellant was not in custody—were not outside the zone of reasonable disagreement. Consequently, appellant's statements to the police officers during the traffic stop did not stem from "custodial interrogation." Therefore, the lack of *Miranda* and article 38.22 warnings did not require the suppression of the statements.[7] Accordingly, we hold that the trial court did not abuse its discretion in denying appellant's motion to suppress the statements. We overrule appellant's second and third points of error.

---

[7] In his third point of error, appellant summarily asserts that "the requirements of [article 38.22] were not met." To the extent that appellant complains about alleged non-compliance with the requirement that the statement be electronically recorded, *see* Tex. Code Crim. Proc. art. 38.22, § 3, that requirement likewise does not apply because appellant's statement did not stem from "custodial interrogation." Moreover, we note that appellant's statements were electronically recorded on Officer Floyd's dash-cam video.

23

## CONCLUSION

Having concluded that the trial court did not abuse its discretion in denying appellant's pretrial motion to suppress, we affirm the trial court's judgment of conviction.

_____

Edward Smith, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   May 30, 2019

Do Not Publish